QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kevin Y. Teruya (Bar No. 235916)
  kevinteruya@quinnemanuel.com
  Adam B. Wolfson (Bar No. 262125)
  adamwolfson@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Intuit Inc. and Intuit Payment Solutions, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| INTUIT INC. and INTUIT PAYMENT SOLUTIONS, LLC, <br><br>                     Plaintiffs, <br><br>     v. <br><br> VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, and MASTERCARD INTERNATIONAL INCORPORATED, <br><br>                    Defendants. | CASE NO.: <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

OVERVIEW ................................................................................................................ 1

JURISDICTION AND VENUE .................................................................................. 7

DEFINITIONS ........................................................................................................... 8

THE PARTIES .......................................................................................................... 12

CO-CONSPIRATORS ............................................................................................. 14

FACTUAL ALLEGATIONS .................................................................................... 16

    A.    Defendants' Cartels ................................................................................ 16

        1.    Visa and Mastercard facilitated horizontal conspiracies of their member banks. ........................................................................ 19

        2.    The Honor All Cards rules constituted unjustifiable horizontal agreements not to compete on price. .................................................. 20

        3.    The "default" Interchange Fee rules are unlawful horizontal agreements on price. ................................................................. 21

        4.    Merchants in non-ISO and non-PayFac transactions pay Interchange Fees directly, and ISOs and PayFacs pay Interchange Fees directly in the transactions they facilitate. ................................. 23

        5.    Defendants have used their price-fixing schemes to establish, maintain, and enhance their long-held market power. ...................... 24

            (a)    Ability to raise Interchange Fees with impunity .............................. 25

                (i)    Visa ............................................................................ 25

                (ii)    Mastercard ................................................................ 27

            (b)    Price discrimination ................................................................. 28

            (c)    Setting supracompetitive prices unrelated to cost .......................... 29

            (d)    Enforcement of anticompetitive rules and policies ........................ 30

            (e)    Forcing merchants, ISOs, PayFacs, and consumers to accept outdated, less secure products .............................................. 30

        6.    The Visa and Mastercard IPOs were changes in corporate form that maintained and enhanced the cartels. ........................................ 35

7.  Defendants' price-fixing schemes also are unlawful price constraints.................................................................41

B.  Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without Justification ..................................................42

1.  Banks would profit from issuing General Purpose Debit Cards even without collectively-set Interchange Fees. .....................42

2.  Banks would profit from issuing General Purpose Credit Cards even without collectively-set Interchange Fees. .....................45

3.  Anti-steering rules hide the costs of Visa and Mastercard transactions from consumers, thereby inhibiting competition from other networks and reinforcing the Visa and Mastercard cartels. ...............48

C.  Visa and Its Member Banks Engaged in Additional Anticompetitive Conduct That Monopolized, or Attempted to Monopolize, the General Purpose Debit Card Transaction Market ........................................50

1.  Visa's strategy to maintain its monopoly power in the General Purpose Debit Card Transaction Market. .......................50

2.  Visa's strategy to maintain its monopoly power in the General Purpose Debit Card Transaction Market, post-Durbin.................52

ANTITRUST INJURY ...............................................................................56

RELEVANT MARKETS.............................................................................58

CLAIMS FOR RELIEF ...............................................................................60

Count 1:  Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the General Purpose Credit Card Transaction Market (Section 1 of Sherman Act) ...............................................60

Count 2:  Against Visa for Horizontal Price Fixing and  Horizontal Agreements Not to Compete in the General Purpose  Debit Card Transaction Market (Section 1 of Sherman Act) ...............................................61

Count 3:  Against Mastercard for Horizontal Price-Fixing and  Horizontal Agreements Not to Compete in the General Purpose  Credit Card Transaction Market (Section 1 of Sherman Act)........................................62

Count 4:  Against Mastercard for Horizontal Price-Fixing  and Horizontal Agreements Not to Compete in the General Purpose  Debit Card Transaction Market (Section 1 of Sherman Act)........................................63

Count 5:  Against Visa for Price Restraints in the  General Purpose Credit Card Transaction Market (Section 1 of Sherman Act)..............................................64

Count 6:  Against Visa for Price Restraints in the General Purpose Debit Card Transaction Market (Section 1 of Sherman Act)........................................65

-ii-

Count 7:  Against Mastercard for Price Restraints in the  General Purpose Credit Card Transaction Market (Section 1 of Sherman Act)................................66

Count 8:  Against Mastercard for Price Restraints in the  General Purpose Debit Card Transaction Market (Section 1 of Sherman Act)................................66

Count 9:  Against Visa for Monopolization of the  General Purpose Debit Card Transaction Market (Section 2 of Sherman Act)......................................67

Count 10:  Against Visa for Attempted Monopolization of the  General Purpose Debit Card Transaction Market  (Section 2 of Sherman Act)...............................68

Count 11:  Against Visa for Conspiracy to Monopolize the  General Purpose Debit Card Transaction Market (Section 2 of Sherman Act)..............................69

Count 12:  Against Visa for Violation of California State  Antitrust Law in the General Purpose Credit Card Transaction  Market (Cal. Bus. & Prof. Code § 16700 *et seq.*) ...........................................................69

Count 13:  Against Visa for Violation of California State Antitrust Law  in the Market for General Purpose Debit Card Services (Cal. Bus. & Prof. Code § 16700 *et seq.*) .................................................................71

Count 14:  Against Mastercard for Violation of California State  Antitrust Law in the General Purpose Credit Card Transaction Market (Cal. Bus. & Prof. Code § 16700 *et seq.*)..........................................................72

Count 15:  Against Mastercard for Violation of California State  Antitrust Law in the General Purpose Debit Card Transaction Market (Cal. Bus. & Prof. Code § 16700 *et seq.*)...........................................................74

Count 16:  Against Visa for Unfair and Unlawful Business Practices in Violation of California State Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*) .........................................................................76

Count 17:  Against Mastercard for Unfair and Unlawful Business Practices in Violation of California State Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*)...............................................76

Count 18:  Against Visa and Mastercard for Violation of State  Antitrust and Unfair Competition Laws ...............................................77

PRAYER FOR RELIEF.................................................................80

JURY DEMAND ........................................................................80

Plaintiffs Intuit Inc. and Intuit Payment Solutions, LLC ("IPS," together with Intuit Inc. and their respective subsidiaries, affiliates, assignors, and other related entities, "Intuit") bring this action against Defendants Visa U.S.A. Inc. ("Visa U.S.A."), Visa International Service Association ("Visa International"), Visa Inc., (collectively with Visa U.S.A. and Visa International, "Visa"), Mastercard Incorporated, and Mastercard International Incorporated ("Mastercard International," collectively with Mastercard Incorporated, "Mastercard," and collectively with Visa, "Defendants"), under federal and state antitrust laws, as follows:

## OVERVIEW

1.     For years, Visa, Mastercard, and the conglomeration of banks that started each organization and continue to participate as members of their respective networks (which today comprises nearly every bank in the U.S.), have sought to protect their inflated profits and dominant market positions at the expense of fair competition, the health of the United States economy, and the security of the payment cards used by American consumers.  Visa, Mastercard, and their member banks have unlawfully fixed at high levels the so-called "interchange" fees that merchants, Independent Sales Organizations ("ISOs"), and Payment Facilitators ("PayFacs") must pay for a debit or credit card transaction.[1]  They have also pushed consumers to use payment card technology that Visa, Mastercard, and their member banks know is defective and subject to fraud in order to maintain transaction volume and Interchange Fees on their credit and signature debit networks (which are higher than on other types of networks), and have colluded with each other to do so.  As a result of their conduct, during the time period covered by this case, United States businesses were subject to the highest payment card related fees in the world, and United States consumers experienced the highest rates of payment card fraud in the world.

2.     Visa, Mastercard, and their member banks have perpetuated this state of affairs because they have a dominant place in the market as it exists today; and the continuation of the status quo protects them from the genuine competition they fear.  Going back many years, Visa,

---

[1]   As discussed below, Intuit acted as a merchant, ISO, and PayFac during the Damages Period; and therefore seeks damages for the anticompetitively high fees it paid in each role.

Mastercard, and their member banks have extracted hugely profitable fees from merchants, ISOs, and PayFacs by engaging in anticompetitive agreements between and among Visa and the Visa member banks, and Mastercard and the Mastercard member banks, to fix the fees paid by merchants, ISOs, and PayFacs on every payment card transaction on their network at inflated levels that are shielded from competition.

3.      Rather than competing for acceptance in a free market, Visa, Mastercard, and their member banks fix the interchange rates that merchants, ISOs, and PayFacs must pay for every transaction, and enforce rules that limit card issuer competition.  This long-standing and ongoing price fixing, along with various rules, such as the so-called "Honor All Cards" rules, and other restraints described more fully below, prevent competition for acceptance among issuing banks and for transaction volume among networks.  These agreements artificially inflate the prices that Intuit and others pay for credit and debit transactions over the Visa and Mastercard networks, which in turn lead to inflated retail prices borne by consumers across the entire economy, thus suppressing overall output.

4.      The Visa and Mastercard "Honor All Cards" rules, which are functionally identical, require merchants, ISOs, and PayFacs that accept *any* credit (or debit) cards to accept *all* credit (or debit) cards within each network.  These rules make card acceptance within each network an all-or-nothing decision—they must accept *all* issuing banks' cards, or accept *no* cards.  Because acceptance of no cards within a network is an unrealistic option for nearly all merchants, ISOs, and PayFacs, they must accept every card issued by every issuer on whatever terms were set within the network.  These rules were adopted and promulgated by agreement among the banks that, before the Visa and Mastercard IPOs, owned and operated those companies and which have continued to abide by those rules and have not withdrawn from their agreement.  The rules artificially bolster and maintain Visa and Mastercard's dominance, and also constitute an agreement among the banks that issue cards within each network (which are substantially overlapping, are otherwise competitors at the same level of the market structure, and comprise nearly every bank in the country) not to compete with each other for acceptance of their cards by

1    offering or being willing to negotiate lower interchange fees or other better terms, and thus have

2    the effect of fixing prices.

3         5.       Visa, Mastercard, and their member banks enforce their price-fixing agreements by

4    mandating that all banks adhere to their network rules, monitoring transactions to identify member

5    banks offering lower interchange fees in violation of Visa's and Mastercard's interchange rate

6    rules, and subjecting any such banks to fines and even expulsion from the Visa and Mastercard

7    networks.  The banks are willing participants because adhering to these rules greatly reduces

8    competition between them regarding card issuance.  Indeed, it was the banks that founded Visa

9    and Mastercard to act as their cartel managers, and which helped to originally institute the rules

10   that continue to harm competition and interchange fee payors to this day.

11        6.       These rules and other restraints described below harm competition in multiple

12   ways.  First, the rules and restraints resulted in increased transaction prices above competitive

13   levels for merchants, ISOs, PayFacs, and consumers.  The effect of the increase in interchange

14   fees paid by merchants, ISOs, and PayFacs was not offset by the effect of any increase in benefits

15   provided to consumers.  Second, the rules and restraints decreased transaction volume (or output)

16   below competitive levels for merchants, ISOs, PayFacs, and consumers.  As transaction prices

17   increased, transaction volume (or output) decreased.  Third, during the Damages Period, the rules

18   and restraints prevented competition and innovation from new entrants, including new card

19   networks and payment and business models offering lower interchange fees and new and better

20   benefits and products, and slowed adoption of more secure and fraud-resistant technologies,

21   including the Personal Identification Number ("PIN") authentication and EMV chips adopted in

22   other countries, resulting in higher interchange fees and fraud rates in the United States.

23        7.       Another threat to Visa, Mastercard, and their member banks' ability to maintain

24   this highly profitable price-fixing regime comes from PIN networks, which offer merchants, ISOs,

25   and PayFacs more routing options and lower fees, as well as greater security for both them and

26   consumers.  PIN technology arose in the context of ATM-machine networks, which eventually

27   branched out beyond ATMs to provide debit and cash-back services.  Cards utilizing PIN

28   technology often had a number of competing PIN networks all installed on the card, and these

-3-

networks could compete on price in order to win every transaction.  In fact, at one point, PIN networks even charged *negative* prices to utilize their PIN networks.

8.     But even with PIN networks offering low or even negative prices to merchants, ISOs, and PayFacs, they have been unable to threaten Visa and Mastercard's market dominance.  For years, Visa and Mastercard have successfully avoided having banks issue credit cards allowing for PIN authorization, even though PIN authorization is used for credit transactions in other countries and is more secure for consumers, merchants, ISOs, and PayFacs.  In the United States, each credit card has only a single network installed on a card.  The single-network-per-card structure in the credit card market is not a coincidence—it is the result of explicit, respective agreements between Visa and Mastercard, on the one hand, and, on the other hand, the card-issuing banks on their network.  These agreements and rules, including those known as "no-multi-issuer rules," ensured that each Issuer only enables a single network on each credit card.

9.     The issuing banks—the primary shareholders of Visa and Mastercard—have little reason to resist Visa and Mastercard's attempts to limit the use of PIN technology.  These banks profit from Visa and Mastercard's market power by charging supracompetitive interchange fees on signature transactions.

10.     As noted, because debit transactions arose from the ATM (or PIN-based) networks, debit cards often can have more than one network enabled on a card.  Yet Visa and Mastercard have perpetuated a regime in which there is a "signature" option on the front of a debit card (usually Visa or Mastercard), with the "PIN" options relegated to the back of the card.  Intuit and other major merchants, ISOs, and PayFacs generally prefer to route debit transactions over PIN networks so they can foster competition and have the benefit of lower PIN debit prices and more security.  Visa and Mastercard, however, have each systematically worked with their member banks to prevent merchants, ISOs, and PayFacs from being able to take advantage of these options in a significant way, and made it so the banks that issue debit cards installed *Visa or Mastercard itself* as the sole PIN option on the back of the card, using the inflated interchange fees they generated from their price fixing scheme.

-4-

11.     In July 2010, with the passage of the "Durbin Amendment," as discussed more fully below, Congress made an effort to bring more competition to the market and to address Visa's and Mastercard's ability to exercise substantial market power by raising interchange fees well above costs.  The Durbin Amendment provided that one network (such as Visa) could not be both the signature debit option on the front of the card and the only PIN debit option on the back of the card.  It also capped the interchange fees that could be charged on many signature debit transactions.  As a result, the Durbin Amendment had the potential to introduce more competition from PIN-based networks and to limit the incentives of issuing banks to remain willing participants in the conspiracy to favor signature over PIN.

12.     But Visa and Mastercard responded by taking steps, including in direct coordination with each other, to prevent PIN competition from emerging even after this congressional action.  For example, Visa and Mastercard—in striking lockstep—announced they would punish Issuer Banks that even considered supporting PIN debit options by imposing massive new fees on them by fiat.  Visa announced that, starting in April 2016, it would impose a new 5 basis points fee, called a Delayed De-Conversion Assessment ("DDCA"), on any card issuer that indicated an intent to change its business status or network affiliation or that experienced a material decline in Visa payment volume.  Mastercard similarly announced it was radically increasing its so-called "volume assessment" fee to penalize card issuers when volume is processed over PIN debit networks.  These fees are nothing other than blatant efforts to prevent competition, and Visa and Mastercard announced them in lockstep to make sure issuing banks knew they would face retribution for supporting PIN debit options.  Visa and Mastercard have also used consumers' lack of sophistication to circumvent the Durbin Amendment's goal of providing merchants, ISOs, and PayFacs with routing choice.

13.     After complaints were raised by many in the industry about Visa's new DDCA, Senator Richard Durbin wrote to Visa expressing serious concern about Visa's effort to impose a "significant penalty on card issuers that try to shift their business from Visa to a competing card network or that see their business shifted to competing networks through market forces."  After receiving this letter, Visa indicated it would not proceed with imposing the DDCA.  But it had

-5-

1    already demonstrated its intention and ability to punish banks who would dare to threaten its

2    market dominance.

3        14.    Following the Durbin Amendment, Visa also imposed on merchants, ISOs, and

4    PayFacs a Fixed Acquirer Network Fee ("FANF"), discussed more fully below, which is a fixed

5    up-front fee merchants, ISOs, and PayFacs must pay to participate in the Visa network and accept

6    *any* Visa credit or debit cards.  A merchant, ISO, or PayFac can avoid this fee only by declining to

7    accept any Visa products—which given Visa's market dominance is a rare occurrence.  But once a

8    merchant, ISO, or PayFac has elected to accept any Visa products, it can only mitigate the FANF

9    by routing PIN debit transactions to Visa, rather than making a second payment to process a

10   transaction over a rival PIN debit network.

11       15.    In addition to these efforts, Visa, Mastercard, and their respective member banks

12   have also prevented reductions in credit and debit card fraud, which drain billions of dollars from

13   the United States economy every year.  For decades, the technology has existed to make credit and

14   debit card transactions safer and less prone to fraud.  Indeed, this technology — the use of PIN

15   verification along with EMV chips ("chip-and-PIN")—has been used widely throughout the world

16   to great success; and regulators, empirical studies, and even Visa and Mastercard agree that chip-

17   and-PIN verification provides far greater security than signature authentication.

18       16.    As a result of Visa and Mastercard's conduct, as alleged herein, the proven method

19   for reducing card fraud, chip-and-PIN technology, is not being used in the United States to a

20   significant degree, even though it is widely used elsewhere around the world.  In fact, while U.S.

21   consumers and merchants, ISOs, and PayFacs—like Intuit and its merchant customers—bear costs

22   related to fraud rates unrivaled in the rest of the industrial world, Visa, Mastercard, and their

23   member banks have acted in concert to prevent the adoption of chip-and-PIN authentication in the

24   United States on a large scale.  While chip-and-PIN authentication is proven to be more secure, it

25   is less profitable for Visa, Mastercard, and their member banks, and it provides a greater threat to

26   their market dominance.

27       17.    Next, Visa and Mastercard have also punished merchants, ISOs, and PayFacs that

28   have attempted to steer customers towards lower-fraud and lower-cost PIN networks.  As a result

-6-

1  of those actions and Defendants' broader anticompetitive scheme to stifle PIN-based

2  authentication and force merchants, ISOs, and PayFacs to accept signature credit cards and

3  signature debit networks, Visa and Mastercard have continued to enjoy the supracompetitive

4  profits generated by their interchange-fee price-fixing scheme and have grown their market

5  share.  Their bank shareholders, too, have continued to reap outsized profits from the highest

6  interchange and related card payment fees in the world.

7      18.     Intuit, on the other hand, has been forced to pay these inflated interchange and

8  related fees while bearing the effects of fraud arising from Defendants' dissemination of defective

9  products.  Intuit is a large and sophisticated business that sells its own products via credit and

10  debit transactions, and also has over the years facilitated many such transactions for merchant

11  customers as an ISO and PayFac, roles in which Intuit, not its merchant customers, paid

12  interchange fees directly.  Yet while Defendants' interchange and related fees are a significant cost

13  for Intuit, these costs remain largely beyond Intuit's control as a result of Defendants' market

14  power.

15      19.     Accordingly, based on the anticompetitive conduct challenged herein, Intuit seeks

16  treble damages and injunctive relief, as appropriate, under federal antitrust law and state laws.

17                    **JURISDICTION AND VENUE**

18      20.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to

19  prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,

20  and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has jurisdiction

21  over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

22      21.     This Court has supplemental jurisdiction over Intuit's state-law claims pursuant to

23  28 U.S.C. § 1367 because those claims are so related to Intuit's claims within this Court's original

24  jurisdiction that they form part of the same case or controversy.

25      22.     This Court has personal jurisdiction over Defendants because, among other things,

26  Defendants:  (a) transact business throughout the United States, including in this District; (b) have

27  substantial contacts with the United States, including in this District; and/or (c) are engaged in an

28  illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to

persons residing in, located in, or doing business throughout the United States, including in this District.

23.     Venue in this District is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22.  Defendants transact business and are found in this District.  In particular, tens of thousands of retail establishments located in this District accept Visa and Mastercard credit cards and debit cards.  Member banks of Visa and Mastercard located in this District issue Defendants' credit, debit, and store-value cards and/or acquire retail merchant transactions for Visa and Mastercard credit, debit, and store-value cards.  The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have had substantial anticompetitive effects in this District.

## DEFINITIONS

24.     The following terms are used in this Complaint:

(a)     "Acquirer" or "Acquiring Bank" means a bank or other financial institution that has been authorized by a General Purpose Payment Card Network to enter into agreements with merchants, ISOs, and PayFacs that enable those entities to accept General Purpose Payment Cards for the purchase of goods and services.  Acquirers authorized by the Visa and Mastercard General Purpose Payment Card Networks to acquire Visa- and/or Mastercard-branded General Purpose Payment Card transactions are members and/or agents of those networks, owned or controlled by Visa's and/or Mastercard's member banks, and co-conspirators of Visa and/or Mastercard and Visa's and/or Mastercard's member banks.

(b)     "Charge Card" (also referred to as "Travel and Entertainment Card" or "T&E Card") is a General Purpose Credit Card for which the cardholder is required, under most circumstances, to pay the card balance in full each month.  Diners Club cards and traditional American Express Green, Gold, Platinum and Centurion (Black) cards without preset spending limits are examples of Charge Cards.

-8-

(c)     "Damages Period" means the time period over which Intuit is entitled to seek a damages award based on the anticompetitive conduct challenged herein, which begins no later than August 2004 and continues through the present.

(d)     "General Purpose Credit Card" means a plastic card or other physical form factor, such as a key fob, as well as a virtual card without a physical form factor, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.  Examples of General Purpose Credit Cards are the Visa and Mastercard personal consumer and corporate credit cards, the Discover credit card issued by Discover Financial Services, and the Optima and Blue-type credit cards issued by American Express.  General Purpose Credit Cards also include Charge Cards such as the traditional American Express cards that require payment at the end of a billing cycle.

(e)     "General Purpose Credit Card Network Services" means the services and infrastructure that a network provides to merchants, ISOs, PayFacs, and issuers through which payment transactions using General Purpose Credit Cards are conducted, including authorization, clearance, and settlement.

(f)     "General Purpose Credit Card Transaction Market" means the transaction market in which General Purpose Payment Card Network providers facilitate General Purpose Credit Card transactions between a merchant and a cardholder, described more fully in Sections A-B, *infra*.

(g)     "General Purpose Debit Card" means a plastic card or other physical form factor, such as a key fob, as well as a virtual card without a physical form factor, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account ("DDA"), at a bank or other financial institution.  Visa's Signature Debit Card program (the "Visa Check Card") and Mastercard's Signature Debit Card program (sometimes referred to as "Debit Mastercard") are General Purpose Debit Cards, as are PIN Debit Cards authorized over Visa's Interlink and Mastercard's Maestro networks.  General Purpose Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's DDA.  Examples include, but are not limited to,

-9-

payroll cards and cards associated with a flexible spending account, health reimbursement arrangement, or health savings account.

(h)     "General Purpose Debit Card Network Services" means the services and infrastructure that a network provides to merchants, ISOs, PayFacs, and issuers through which payment transactions using General Purpose Debit Cards are conducted, including authorization, clearance, and settlement.

(i)     "General Purpose Debit Card Transaction Market" means the transaction market in which General Purpose Payment Card Network providers facilitate General Purpose Debit Card transactions between a merchant and a cardholder, described more fully in Sections A-C, *infra*.

(j)     "General Purpose Payment Card" means a General Purpose Credit Card or a General Purpose Debit Card.

(k)     "General Purpose Payment Card Network" means an electronic payment system used to accept, transmit or process transactions made by General Purpose Payment Cards for money, goods, or services, and to transfer information and funds among Issuers, Acquirers, merchants, ISOs, PayFacs, and users of General Purpose Payment Cards.  Both Visa and Mastercard operate General Purpose Payment Card Networks.

(l)     "General Purpose Payment Card Transaction Markets" means, collectively, the General Purpose Credit Card Transaction Market and General Purpose Debit Card Transaction Market.

(m)     "Interchange Fees" are fees or rates fixed by Visa or Mastercard and their member banks that are paid by merchants, ISOs, or PayFacs in conjunction with transactions in which Visa or Mastercard General Purpose Payment Cards are used as a means of payment for purchases of goods and services.

(n)     "ISO" or "Independent Sales Organization" means an entity that, as relevant to this Complaint, establishes a relationship with an Acquiring Bank and a merchant customer, and provides the latter the capability to access an electronic payment system and therefore accept cards that can transact over the payment system in question.  For this service, the ISO may charge the merchant customer a fee and pays the fees on the credit and/or debit transactions, including the

-10-

Interchange Fees.  For all transactions in which the ISO provides such services to its merchant customers, the ISO is the party that pays and remains responsible for the fees, including if the transaction is charged back or otherwise cancelled.[2]

(o)     "Issuer" or "Issuing Bank" means a bank or other financial institution that issues General Purpose Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations.  Issuers authorized by the Visa and Mastercard General Purpose Payment Card Networks to issue Visa- and/or Mastercard-branded General Purpose Payment Cards are members of those networks.

(p)     "MSP" or "Member Service Provider" means an ISO.  In documents relating to ISOs' roles, they are sometimes alternatively referred to as an MSP or Member Service Provider. As used in this Complaint, ISO includes such alternative terms within its definition.

(q)     "PayFac" or "Payment Facilitator" means an entity that is a merchant of record on credit and debit transactions, and provides merchant customers the capability to access an electronic payment system and therefore accept cards that can transact over the payment system in question.  For this service, the PayFac charges the merchant customer a fee and pays the fees on the credit and/or debit transactions, including the Interchange Fees.  For all transactions in which the PayFac provides such services to its merchant customers, the PayFac remains responsible for those fees, including if the transaction is charged back or otherwise cancelled.

(r)     "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping his or her card at the point-of-sale and entering a personal identification number ("PIN").  PIN Debit Card networks grew out of regional ATM networks and are processed differently than Signature Debit Card transactions. Examples of PIN Debit Card networks include Discover's Pulse network, Visa's Interlink network, Mastercard's Maestro network, FIS's NYCE network, and First Data Corporation's STAR network.

---

[2]  ISOs are sometimes also called "Member Service Providers."

(s)     "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder.  The "Visa Signature Preferred Card" product and "World Mastercard Card" product are examples of Premium Payment Cards.

(t)     "Signature Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.  Signature Debit Card transactions are processed in the same way as General Purpose Credit Card transactions.  Examples of Signature Debit Cards include the Visa Check Card product and the Debit Mastercard product.

### THE PARTIES

25.     Plaintiff Intuit Inc. is a Delaware corporation with its principal place of business at 2700 Coast Avenue, Mountain View, CA 94043.  Intuit and its assignors (see below) accept Visa and Mastercard credit and debit cards for payment for Intuit products online.

26.     Plaintiff Intuit Payment Solutions, LLC (f/k/a Innovative Merchant Solutions, LLC) is a California LLC with its principal place of business at 26541 Agoura Road, Suite 200, Calabasas, CA 91302.  IPS also has acted as an ISO and PayFac for years and accepted and helped merchants accept Visa and Mastercard cards in that role (and directly paid the fees at issue in this Complaint on those transactions).

27.     In addition to their own respective claims, Intuit Inc. and Intuit Payment Solutions, LLC have the right to assert, whether by assignment, operation of law, or other legal means, all claims described herein that were held by the following entities:  CBS Employer Services, Inc.; Computing Resources, Inc.; Dallas Innovative Merchant Solutions, LLC; Digital Insight Corporation; Docstoc, Inc.; Electronic Clearing House, LLC (formerly known as Electronic Clearing House, Inc.); Intuit Administrative Services Inc.; Intuit Consumer Group LLC (formerly known as Intuit Consumer Group Inc.); Intuit Do-It-Yourself Payroll; Intuit Financing Inc.; Intuit Mint Bills, Inc.; Intuit Mint Bills Payments, Inc.; Intuit Payments Inc.; Intuit Payroll Holding, LLC; Intuit Payroll Services, LLC; Lettuce Inc.; Medfusion; Merchant America Inc.; Mint

-12-

Software Inc.; PayCycle, Inc.; Payroll Solution, Inc.; Quicken Investment Services, Inc.; Superior Bankcard Service, LLC; TSheets Holdco Inc.; TSheets.com, LLC; and XpressChex, Inc.  At the time of any respective assignment, the assigning entity was an Intuit Inc. or Intuit Payment Solutions, LLC subsidiary; and such assignment was effected pursuant to all applicable corporate and other legal requirements.

28.     Until the corporate restructuring and IPO described below, Defendant Visa International operated as a non-stock nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Visa International's owner/members included approximately 21,000 banks.

29.     Prior to the corporate restructuring and IPO, Defendant Visa U.S.A. was a non-stock nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Visa U.S.A.'s owner/members included approximately 14,000 banks.  Visa U.S.A. was a regional group member of Visa International.

30.     Prior to the Visa IPO, Visa International and Visa U.S.A. were each governed by a board of directors comprised of bank executives selected from their member banks.  Visa International also had regional boards of directors for each of its geographic regions.

31.     In 2007 and 2008, Visa U.S.A. and Visa International, in addition to other Visa entities not named as Defendants, conducted a number of corporate restructurings to combine several previously independent corporate entities into Defendant Visa Inc.  On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its member banks.  As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in Foster City, California.  Upon the restructuring, Visa U.S.A. and Visa International became wholly-owned subsidiaries of Visa Inc., and they continue to operate as such today.  Visa Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

32.     Visa operates General Purpose Payment Card Networks, and did so throughout the Damages Period.

-13-

33.     Prior to the Mastercard IPO, Defendant Mastercard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant Mastercard International, a wholly-owned subsidiary of Mastercard Incorporated with its principal place of business also in Purchase, New York, was a Delaware membership corporation that, prior to the Mastercard IPO, consisted of more than 23,000 owner/member banks worldwide and was the principal operating subsidiary of Mastercard Incorporated.

34.     Prior to the Mastercard IPO, Mastercard Incorporated and Mastercard International were governed by a global board of directors, as well as regional boards of directors for each of their geographical regions, that were comprised of bank executives selected from their member banks.

35.     On May 25, 2006, Mastercard Incorporated and Mastercard International conducted an initial public offering and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to Mastercard's member banks.  As a result, Mastercard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York.  Upon the restructuring and continuing to this day, Mastercard International has remained Mastercard Incorporated's principal operating subsidiary with its principal place of business also in Purchase, New York, and doing business as Mastercard Worldwide.  Mastercard Incorporated and Mastercard International (and Mastercard Worldwide) are collectively referred to herein as "Mastercard."

36.     Mastercard operates General Purpose Payment Card Networks and did so throughout the Damages Period.

## CO-CONSPIRATORS

37.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies.  As more fully discussed herein, the co-conspirators include, but are not limited to, the following:  (a) Issuing Banks (or Issuers) that have issued Visa and Mastercard payment cards and have agreed to set, fix, and enforce,

-14-

through anticompetitive rules and restraints, Visa and Mastercard Interchange Fees; (b) Acquiring Banks (or Acquirers) who acquire Visa and Mastercard transactions from Intuit and other merchants, ISOs, and PayFacs, and who have agreed to and imposed the anticompetitive rules and restraints on Intuit and other merchants, ISOs, and PayFacs; and (c) banks that have or had membership on Visa's or Mastercard's board of directors and specifically adopted and agreed to impose the challenged rules and restraints upon Intuit and other merchants, ISOs, and PayFacs. These banks are referred to as "member banks" in this Complaint.

38.     An Issuing Bank is a member of Visa or Mastercard that issues payment cards to consumers for use as a payment device.  Issuing Banks are horizontal competitors and, prior to Visa's and Mastercard's respective IPOs, sat on the companies' Boards of Directors, which allowed them to not only help develop the rules at issue in this case, but also agree to and implement them throughout the nation.  Following the IPOs, the Issuing Banks remained members of Visa and Mastercard and reaffirmed their participation in the anticompetitive scheme by virtue of that membership and continuing agreement to the rules.

39.     Each Issuing Bank is a separate economic actor expected to pursue independent economic interests.  In other aspects of their businesses, Issuing Banks compete against one another.  For example, they can compete for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will make their cards more attractive than those offered by other Issuing Banks.  As the district court found in *United States v. Visa U.S.A., Inc., Visa International Corp., and Mastercard International Inc.*, cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protections programs."  163 F. Supp. 2d 322, 334 (S.D.N.Y. 2001).

40.     As a result of the conduct challenged herein, however, Issuers do not compete for acceptance of the cards they issue.  Instead, by continuing to agree to and adhere to the anticompetitive restraints and "default" Interchange Fees, Issuers have deprived the marketplace of independent centers of decision-making and, therefore, actual and potential competition.

-15-

41.     Merchants, ISOs, and PayFacs, including Intuit, purchase credit and debit card network services from Visa and Mastercard through the Visa and Mastercard networks' Acquiring Bank members (which also are often Issuing Banks).  All Acquiring Banks are members of Visa and Mastercard, acquire payment transactions from merchants, ISOs, and PayFacs, and enforce agreed-upon association rules, regulations, restraints, and fee structures.  As member banks, Acquirers act as gatekeepers, ensuring that card transactions are routed over the Visa and Mastercard networks, that Interchange Fees set by the networks are paid on all transactions, and that merchants, ISOs, and PayFacs abide by the networks' rules.  Both before and after the Visa and Mastercard corporate restructurings, association rules guarantee that the member banks are involved in every step of a payment card transaction.  Subject to the anticompetitive restrictions and practices alleged herein, Acquiring Banks are horizontal competitors.

42.     Acquiring Banks are participants in a conspiracy with each other, with Issuing Banks (which also often act as both Issuer and Acquirer), and with Visa and Mastercard to set, fix, and enforce Interchange Fees at supracompetitive levels and impose restrictive and anticompetitive rules on merchants, ISOs, and PayFacs (including Intuit)—practices that prevent those entities from using the price mechanism and price competition to drive interchange rates down to the competitive level that would exist in the absence of the anticompetitive rules.

43.     Acquirers and Issuers have had actual knowledge of and have knowingly participated in the conspiracy not to compete for merchant acceptance, to collectively set Interchange Fees and then enforce those Interchange Fees by imposing restrictive rules upon Intuit and other merchants, ISOs, and PayFacs.

## FACTUAL ALLEGATIONS

**A.     Defendants' Cartels**

44.     Defendants created and maintain twin cartels that implemented their agreements to fix prices, to avoid competition, and to protect their market power.  One conspiracy was perpetrated by Visa and its member banks; the other was perpetrated by Mastercard and its member banks.  Both conspiracies are ongoing.

-16-

45.     One of the main pillars of each of these conspiracies is Visa's and Mastercard's Honor All Cards rules.  Pursuant to these rules, each network's member/owner banks have agreed that any merchant, ISO, or PayFac that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network must accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.  These "all or nothing" rules constitute agreements among the banks not to compete for acceptance of their General Purpose Credit (or Debit) Cards.

46.     To reinforce their agreements not to compete for acceptance, each network's Issuers have colluded to fix the Interchange Fees they charge Intuit and other merchants, ISOs, and PayFacs on every transaction through the "default" Interchange Fee rules.  This collusive practice has prevented Intuit and other merchants, ISOs, and PayFacs from realizing the price-reducing benefits of Issuers competing on price, which would have occurred in a competitive market.  Instead, any merchant, ISO, or PayFac accepting either Visa or Mastercard General Purpose Payment Cards pays the same Interchange Fee on a given transaction regardless of which Issuer is involved.  There is no competition.  Within each conspiracy, Issuers charge merchants, ISOs, and PayFacs exactly the same inflated prices that are the products of the banks' collusion.  These banks typically compete for cardholders, but they do not compete for acceptance or over the Interchange Fees that merchants, ISOs, and PayFacs must pay to accept their Visa and Mastercard cards.

47.     Visa and Mastercard are the enterprises by which competing banks implement and effectuate their agreements not to compete and agreements to fix prices.  These schemes rely on rules—such as the Honor All Cards rules, "default" Interchange Fee rules, and other rules and policies that establish mechanisms for monitoring and enforcing these price-fixing schemes—that bind all Visa and Mastercard Issuers and Acquirers.

48.     In addition to inflicting direct financial harm on Intuit and other merchants, ISOs, and PayFacs with these price-fixing conspiracies, Defendants also have used these rules and policies to acquire and maintain their substantial market power and discourage new entry. Specifically, Visa and Mastercard used these supracompetitive Interchange Fees as an incentive for Issuers (who receive the Interchange Fees paid by merchants, ISOs, and PayFacs) to issue Visa

-17-

and Mastercard General Purpose Payment Cards.  Using price fixing to induce Issuers to join their cartels, Visa and Mastercard acquired sufficient market power in the General Purpose Payment Card Transaction Markets such that most merchants, ISOs, and PayFacs were compelled to accept their cards for payment.

49.     Moreover, once a merchant, ISO, or PayFac started accepting Visa's and Mastercard's General Purpose Payment Cards for payment, it was virtually impossible to stop accepting them; and the merchant, ISO, or PayFac had to accept these cards on Visa's and Mastercard's terms—consistently routing the transactions using signature authentication.  Once Visa and Mastercard acquired substantial market power over merchants, ISOs, and PayFacs, they maintained it by forcing merchants, ISOs, and PayFacs to pay ever higher Interchange Fees on these signature transactions, to continue to fund these price-fixing schemes and thereby maintain and enhance their cartels' market power through the present day.

50.     Although Visa and Mastercard initially focused their anticompetitive conduct on General Purpose Credit Cards, once they achieved substantial market power in the General Purpose Credit Card Transaction Market they leveraged it to achieve substantial market power in the General Purpose Debit Card Transaction Market by forcing merchants, ISOs, and PayFacs to accept Defendants' Signature Debit Card transactions as a condition of accepting Defendants' dominant General Purpose Credit Card transactions and by engaging in a variety of other exclusionary conduct.

51.     As the natural and intended consequences of their anticompetitive conduct, Defendants set both General Purpose Credit Card and Debit Card Interchange Fees at supracompetitive levels—fees paid by merchants, ISOs, and PayFacs.  Those entities continue to pay these fees to this day.

52.     Defendants' anticompetitive conduct was not reasonably necessary to operate their General Purpose Payment Card Networks.  Domestic and international examples demonstrate that Interchange Fees are economically unnecessary to incentivize Issuers to issue General Purpose Payment Cards or for payment systems to function, meaning that competition for such fees in the U.S. would not have unreasonably impaired the ability to operate a General Purpose Payment

-18-

Card Network here.  Issuers' collusively-fixed, supracompetitive Interchange Fees are unjustifiable.

### 1. Visa and Mastercard facilitated horizontal conspiracies of their member banks.

53.     As owners of Visa and Mastercard, and as board members and participants in key operating committees of pre-IPO Visa and Mastercard, the member banks conspired to control every aspect of Visa's and Mastercard's business.  Such collective control was used to implement the member banks' agreements not to compete for acceptance of General Purpose Payment Cards, and the associated agreements to fix the prices of Interchange Fees for Visa and Mastercard General Purpose Payment Card transactions.  The member banks ratified the "default" Interchange Fee schedules that were recommended by staff and consultants of Visa and Mastercard.  The conspiracies broadened as more banks joined Visa and Mastercard and agreed to abide by agreements not to compete and to fix prices.  The conspiracies also broadened during that time period when the banks added new high-Interchange Fee products—such as the Visa Signature and Signature Preferred Cards and the World and World Elite Mastercard Cards—to the universe of Visa and Mastercard products that were subject to the conspiracies.

54.     In a decision affirming the condemnation of other exclusionary rules of Visa and Mastercard, the Second Circuit held in 2003 that Visa and Mastercard:

> are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions.  These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These competitors have agreed to abide by a restrictive exclusivity provision. . . . *The restrictive provision is a horizontal restraint adopted by 20,000 competitors.*

*United States v. Visa U.S.A., Inc., Visa Int'l Corp., & Mastercard Int'l Corp.*, 344 F.3d 229, 242 (2d Cir. 2003) (emphasis added).  Like those restrictive provisions to which the member banks agreed in their capacities, *inter alia*, as board members and/or owners of Visa and Mastercard, the anticompetitive conduct by Visa and Mastercard establishing the agreements not to compete and

-19-

1   price-fixing schemes were the products of conspiracies among competing Issuers—conspiracies

2   that continue to this day.

3                    **2.      The Honor All Cards rules constituted unjustifiable horizontal**

4                          **agreements not to compete on price.**

5          55.     In order to eliminate any incentive for Issuers to compete for acceptance based on

6   the price of interchange, as they would have done in a competitive market, the member banks on

7   Visa's and Mastercard's governing boards of directors approved the Honor All Cards rules.  *See,*

8   *e.g.*, Visa Rule 5.2.B, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov.

9   15, 2008); Rule 5.6.1, *MasterCard Rules* (Feb. 2008).  The rules require a merchant, ISO, or

10  PayFac to accept *all* of a network's Issuers' General Purpose Credit (or all Debit) Cards bearing

11  the network's brand if that merchant, ISO, or PayFac wants to accept any single Issuer's General

12  Purpose Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.  These rules

13  also prohibit merchants, ISOs, and PayFacs from practices steering consumers from using one

14  Issuer's Visa or Mastercard General Purpose Payment Cards to using General Purpose Payment

15  Cards issued by other Issuers or other cheaper forms of payment.

16         56.     These "all or nothing" rules support Defendants' cartels in the following manner.

17  By forcing a merchant, ISO, or PayFac to accept all General Purpose Credit (or Debit) Cards

18  bearing the network's brand, while barring merchants, ISOs, and PayFacs from steering by any

19  Issuer, Issuers need not worry about losing business to a lower-cost competitor because all cards

20  issued by every Issuer must be accepted at the "default" Interchange Fee rates.  Thus, a merchant,

21  ISO, or PayFac that accepts cheaper Visa (or Mastercard) standard General Purpose Credit Cards,

22  for which the merchant, ISO, or PayFac would pay substantially lower, but still supracompetitive

23  Interchange Fees, must also accept a Visa Signature Preferred Card transaction, which bears a

24  higher Interchange Fee.  Because of the Honor All Cards rules, Issuers have no incentive to enter

25  into bilateral agreements outside the conspiracy, *i.e.*, Issuers are incentivized not to "cheat" on the

26  price-fixing scheme.  Thus, the "default" Interchange Fees have become a price floor.

27         57.     If there had been no Honor All Cards rules, it would have been in the economic

28  interest of an individual, profit-maximizing Issuer to lower the price it charged in order to compete

-20-

for merchants, ISOs, and PayFacs' business against other banks issuing similar General Purpose Payment Cards. These "all or nothing" rules, however, eliminated the incentives to engage in such competition and to lower prices below the anticompetitive, cartel-determined levels set forth in the "default" Interchange Fee schedule. With the Honor All Cards rules in place, it does not make economic sense for any Issuer to compete on price because merchants, ISOs, and PayFacs are forced to accept that Issuer's cards even though they are being charged inflated prices fixed by the cartels. Because of these rules, Issuers have rebuffed overtures from merchants, ISOs, and PayFacs to enter into direct arrangements that would have benefited the Issuer.

### 3.    The "default" Interchange Fee rules are unlawful horizontal agreements on price.

58.    The "default" Interchange Fee rules are the mechanisms Defendants use to fix the prices of Interchange Fees. Both Visa and Mastercard require that a "default" Interchange Fee apply to every transaction for which the Issuer and Acquirer has not entered into a separate, individually-negotiated agreement regarding fees (*i.e.*, bilateral agreement). *See, e.g.*, Visa Rule 9.5, *Visa U.S.A. Inc. Operating Regulations, Volume I—General Rules* (Nov. 15, 2008) ("These Interchange Reimbursement Fees apply in all circumstances where Members have not set their own financial terms for the Interchange . . ."); Rule 9.4, *MasterCard Rules* (Feb. 2008) ("The Corporation has the right to establish default interchange fees . . . it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee . . . agreement. . . . Unless an applicable bilateral interchange fee . . . agreement . . . is in place, any intraregional or interregional fees established by the Corporation are binding on all Members."). These rules have underpinned the Interchange Fee schedules, which have applied to Visa and Mastercard transactions.

59.    While competition would have motivated rival Issuers to charge lower fees than the "default" Interchange Fees, they have not done so because the Honor All Cards rules, working in tandem with the "default" Interchange Fee rules, have eliminated any incentive for Issuers to charge fees below the anticompetitively high levels being fixed by the conspiracies. As a result, member banks have rarely, if ever, entered into bilateral agreements.

-21-

60.     In order to identify any cartel members "cheating" by secretly offering lower Interchange Fees, Visa and Mastercard have monitored each transaction to ensure application of the appropriate Interchange Fee.  At the same time, Visa's and Mastercard's rules have required all Issuers and Acquirers to adhere to all network rules.  *See, e.g.*, Visa Rule 1.2.A, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008) ("A Member must . . . comply with all of the following . . ."); Rule 1.5.5, *MasterCard Rules* (Feb. 2008).  Member banks that have violated any of these network rules have been subject to fines and even expulsion from Visa and Mastercard and, by rule, the networks could not be held liable by these banks.  *See, e.g.*, Visa Rule 1.7, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); Rule 3.1, *MasterCard Rules* (Feb. 2008).  This has enabled Visa and Mastercard to monitor compliance with, and enforce, the rules of their respective cartels.  These rules remain in place to this day.

61.     All Issuers have used the same "default" Interchange Fee schedules for any given Visa and Mastercard payment transaction but, within each of those schedules, there has been wide variability in the fees charged for various transactions.  For example, a schedule of "default" Interchange Fees set different fee levels for different card types (*e.g.*, standard General Purpose Credit Cards versus Premium Payment Cards).  This schedule of "default" Interchange Fees also imposed different fee levels by merchant category, with card-not-present merchants (merchants that sell goods and services to consumers without face-to-face interaction, *i.e.*, typically over the Internet or by telephone or mail-order) having substantially higher rates, and with supermarkets and warehouse clubs having comparatively low rates.  This price discrimination evidences Visa's and Mastercard's substantial market power.  While there were different fees within a given "default" Interchange Fee schedule, every Issuer applied the same fee schedule to a given transaction.  It is this collusion by every Issuer to set identical "default" Interchange Fee schedules that constitutes price fixing.

**4.      Merchants in non-ISO and non-PayFac transactions pay Interchange Fees directly, and ISOs and PayFacs pay Interchange Fees directly in the transactions they facilitate.**

62.      Intuit directly pays to Defendants and/or their co-conspirators and agents Interchange Fees set by and owed to Defendants and/or their co-conspirators and agents in connection with each retail transaction in which it acts as a merchant and a Visa or Mastercard General Purpose Payment Card is used as the method of payment.  For example, in all credit or debit transactions for products and services Intuit sells through its websites, Intuit is the merchant selling the product and pays Interchange Fees for those transactions.

63.      In addition to its merchant role, Intuit has acted variously as an ISO and PayFac during the Damages Period, in which roles it directly paid to Defendants and/or their co-conspirators and agents Interchange Fees set by and owed to Defendants and/or their co-conspirators and agents on transactions that it facilitated for its merchant customers ("Intuit Merchants").

64.      For a portion of the Damages Period, Intuit served as an ISO for certain Intuit Merchants.  As an ISO, Intuit established a relationship with an Acquiring Bank, which allowed it to accept and facilitate Intuit Merchants' ability to accept General Purpose Payment Cards.  The Acquiring Bank would register Intuit as an ISO with Visa and Mastercard; and, in turn, the Acquiring Bank would provide authorization and other services for Intuit and its customers.  Intuit owned accounts at the Acquiring Bank to receive funds and pay fees.

65.      In all transactions for which it acted as an ISO, Intuit directly paid Interchange Fees and charged Intuit Merchants a fee.  Intuit negotiated that separate fee with Intuit Merchants. Intuit, not Intuit Merchants, bore the responsibility for paying Interchange Fees, and, in fact, Intuit did pay those fees.

66.      Intuit held all risk associated with Intuit Merchants' transactions as to Defendants and/or their co-conspirators and agents; and was liable for, *inter alia*, fees set by and owed to Defendants and/or their co-conspirators and agents, such as Interchange Fees.  Similarly, Intuit was responsible for the credit review of all potential merchants and underwriting of all accepted

-23-

ones.  Merchants that Intuit approved and underwrote were then generally able to accept General Purpose Payment Cards from their customers through Intuit's services.

67.    Starting in at least 2013, Intuit alternatively began to offer PayFac services to its customers, which were similar to its ISO services in many respects.  Intuit directly paid (and pays) Interchange Fees in all transactions for which it acts as a PayFac.  Under this model, the PayFac is the "merchant of record" on its merchant customers' transactions.  Beyond this difference, however, the end result is the same with respect to the payment of Interchange Fees.  On each transaction for which the purchaser at a PayFac customer uses a Visa or Mastercard General Purpose Payment Card as their method of payment, the PayFac merchant customer was generally able to accept the purchaser's Visa or Mastercard General Purpose Payment Card through Intuit's PayFac services and Intuit paid the Interchange Fees directly.  For this service, Intuit charged a fee to the merchant customer.  Intuit, not its merchant customers, held the risk for the transactions as to Defendants and/or their co-conspirators and agents; and was liable for, *inter alia*, fees set by and owed to Defendants and/or their co-conspirators and agents, such as Interchange Fees.  Similarly, Intuit was responsible for the credit review and underwriting of all potential merchant customers.

### 5.    Defendants have used their price-fixing schemes to establish, maintain, and enhance their long-held market power.

68.    Using price fixing to induce Issuers to join their price-fixing cartels, Visa and Mastercard acquired substantial market power in the General Purpose Payment Card Transaction Markets, as courts have repeatedly determined.  For example, in *United States v. Visa U.S.A. Inc., Visa International Corp. and MasterCard International Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), the court determined that "[b]ecause Visa and MasterCard have large shares in a *highly* concentrated market with significant barriers to entry, both defendants have market power in the general purpose payment card transaction market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and MasterCard have raised prices and restricted output without losing merchant customers."  *Id.* at 342 (emphasis added).

69.     The United States "prove[d] through the testimony of merchants that they cannot refuse to accept Visa and MasterCard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them."  *Id.* at 340.  The Second Circuit affirmed this determination of market power, holding that "Visa U.S.A. and MasterCard, jointly and separately, have power within the market for network services."  *United States v. Visa U.S.A. Inc., et al.*, 344 F.3d at 239.

70.     These determinations that Visa and Mastercard possessed substantial market power are supported by direct evidence of that power.  That evidence includes:  (1) Visa's and Mastercard's ability to raise Interchange Fees without the loss of acceptance or transaction volume; (2) successful price discrimination such as the price discrimination described above; (3) setting Interchange Fees unrelated to costs; (4) the ability to enforce anticompetitive policies; (5) forcing merchants and consumers to accept inferior and defective products—including products that are susceptible to fraud; and (6) forcing merchants to raise retail prices due to inflated Interchange Fees and other fees, leading to lower economic output due to those higher retail prices.

            (a)     *Ability to raise Interchange Fees with impunity*

                    (i)     *Visa*

71.     Starting in the 1970s, Visa has possessed and exercised substantial market power in the General Purpose Credit Card Transaction Market, and that market power has increased significantly since then.  By the 1990s, Visa General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, ISOs, and PayFacs, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

72.     In the General Purpose Credit Card Transaction Market, Visa raised General Purpose Credit Card Interchange Fees without merchants, ISOs, and PayFacs ceasing to accept Visa's General Purpose Credit Cards.  In fact, Visa typically gained volume after these increases. For example, Visa permitted Issuers to reclassify standard Visa General Purpose Credit Cards as

-25-

Premium Payment Cards.  Issuers responded by converting large portions of their outstanding cards to Signature and World cards, with corresponding higher Interchange Fees; and, at the flip of a switch, the Interchange Fees that Intuit and other merchants, ISOs, and PayFacs paid for transactions made with such cards increased dramatically.

73.     Notwithstanding the vigorous opposition to these punitive price increases, few, if any merchants, ISOs, or PayFacs dropped Visa as a result.  In *United States v. Visa U.S.A. Inc.*, the district court found that the networks had market power because they "raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result." 163 F. Supp. 2d at 340.  The court further concluded that "even a cursory examination of the . . . network market reveals that whether considered jointly or separately, [Visa and Mastercard] have market power." *Id.* at 341.  Visa and Mastercard collectively accounted for over 73% of transaction volume of General Purpose Payment Cards in the United States.  *Id.*

74.     Visa continues to possess by far the highest market shares and the highest number of General Purpose Credit Cards in circulation.  Accordingly, most merchants, ISOs, and PayFacs must accept Visa General Purpose Credit Cards to remain viable.

75.     At or around the beginning of the Damages Period, Visa raised its Signature Debit Card Interchange Fees, and then exercised its monopoly power to increase PIN Debit Card Interchange Fees as well.  Notwithstanding these price increases, Visa's debit volumes have increased during the Damages Period.  As with General Purpose Credit Cards, merchants, ISOs, and PayFacs could not drop Visa's Signature Debit or PIN Debit products despite these significant price increases.  Visa's ability to increase Interchange Fees without losing acceptance or transaction volume directly evidences its monopoly power in the General Purpose Debit Card Transaction Market.

76.     Visa's monopoly power in the General Purpose Debit Card Transaction Market and the supracompetitive nature of General Purpose Debit Card Interchange Fees were confirmed by the passage by Congress of Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin Amendment"), which required the Board of Governors of the Federal Reserve System (the

-26-

"Federal Reserve") to enact regulations to ensure that General Purpose Debit Card Interchange Fees for covered Issuers (*i.e.*, banks with more than $10 billion in assets) are "reasonable and proportional" to Issuer costs.  Section 920(a)(2) of the Electronic Fund Transfer Act, 15 U.S.C. § 1693o-2(a)(2).

77.     In passing the Durbin Amendment, Congress made clear that the statute was designed to address Visa's and Mastercard's ability to exercise substantial market power by raising Interchange Fees well above costs.  Its principal author, Senator Richard J. Durbin, made numerous statements to that effect on the floor of the Senate, including the following:

> For years, Visa and MasterCard, and their big bank backers, have unilaterally fixed prices on the fees small businesses pay every time they accept a debit card from a customer.  The two giant card networks control 80 percent of the debit card market— that is Visa and MasterCard.  And it is no surprise that debit interchange fees have risen, even as the price of processing the transaction has fallen. . . . Finally, Visa, MasterCard, and the Wall Street banks will face some check against their unbridled market power in the credit and debit industries.

156 Cong. Rec. S5,802-03 (daily ed. July 14, 2010).  Even though the Federal Reserve found that most Issuers' costs were slightly above "par" (*i.e.*, zero), to implement the Durbin Amendment it capped both Signature and PIN Debit Interchange Fees at $0.21 plus .05% plus an additional $0.01 fraud-prevention adjustment.  *See Regulation II, Debit Card Interchange Fees and Routing, Final Rule*, 76 Fed. Reg. 43,394, 43,472 (July 20, 2011) (setting the cap at "21 cents and 5 basis points for the value of the transaction"); *Regulation II, Debit Card Interchange Fees and Routing, Final Rule*, 77 Fed. Reg. 46,258, 46,280 (Aug. 3, 2012) (adding the fraud-prevention adjustment). This cap, while significantly above cost for most Issuers, substantially reduced the debit Interchange Fees that prevailed for years due to Visa's dominance of this market.

*(ii)     Mastercard*

78.     Mastercard also has possessed and exercised substantial market power in the General Purpose Credit Card Transaction Market since the 1970s, and Mastercard's market power also has increased significantly over the years.  By the 1990s, Mastercard General Purpose Credit

-27-

Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Mastercard General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, ISOs, and PayFacs, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

79.     Like Visa, Mastercard has continually raised the Interchange Fees that merchants, ISOs, and PayFacs pay for accepting Mastercard General Purpose Credit Cards without losing acceptance.  Like Visa, Mastercard permitted Issuers to reclassify standard Mastercard General Purpose Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that merchants, ISOs, and PayFacs paid for transactions made with such cards increased dramatically.  Notwithstanding the vigorous opposition to these punitive price increases, few, if any merchants, ISOs, or PayFacs, dropped Mastercard as a result.  Once a merchant, ISO, or PayFac begins to accept Mastercard (and Visa) General Purpose Credit Cards, it is virtually impossible for it to stop; and few, if any merchants, ISOs, or PayFacs have.

80.     Mastercard's substantial market power was further evidenced by its ability to successfully charge merchants, ISOs, and PayFacs higher Interchange Fees than Visa charged, even though Mastercard had lower market shares.  Throughout the Damages Period, Mastercard fixed Interchange Fees that were higher than Visa's.  Mastercard designed this strategy to compensate for its self-perceived inferiority to Visa in other dimensions that could make Mastercard less attractive to Issuers absent the higher Interchange Fees.  If it did not have substantial individual market power over merchants, ISOs, and PayFacs, Mastercard could not have consistently and profitably maintained higher Interchange Fees than Visa, a competing network.

(b)     Price discrimination

81.     As one court has held, Visa's and Mastercard's "ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. . . .  Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick and mortar' merchants.  [Visa and

-28-

Mastercard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions." *United States v. Visa U.S.A. Inc., et al.*, 163 F. Supp. 2d at 340-41.

82.     This price discrimination continues today.  Both Visa and Mastercard establish separate Interchange Fees for each merchant category, for each of the networks' card products (credit, signature-debit, PIN-debit, and commercial), and for an individual merchant's acceptance volume.  Thus, two transactions conducted with the same Visa or Mastercard payment card could have vastly different Interchange Fee rates based upon the size or type of merchant that accepted the card.  At the time of that 2001 *Visa U.S.A.* decision, Visa had twenty-one separate interchange categories, while Mastercard had nineteen.  By 2011, Visa had 104 separate interchange categories, while Mastercard had 275.

*(c)     Setting supracompetitive prices unrelated to cost*

83.     Visa and Mastercard did not set Interchange Fees based upon cost, as they would have done in a competitive market.  For example, with respect to the General Purpose Debit Card Transaction Market, as noted above, the Federal Reserve found in 2011 that Visa's and Mastercard's Signature Debit and PIN Debit Card rates were substantially above cost.

84.     Rather than being tied to costs, the networks set Interchange Fees for each merchant segment based upon that segment's elasticity of demand—*i.e.*, the degree to which merchants, ISOs, and PayFacs in that segment "must take" their cards.  Mastercard's U.S.-based Associate General Counsel testified before the European Commission that Mastercard performed cost studies "to answer the question:  'How high could interchange fees go before we would start having either serious acceptance problems . . . [or] surcharging or discounting for cash." European Commission Decision, COMP/34.579, ¶ 175 (Dec. 19, 2007).  He testified that the Mastercard interchange fees there were "not designed to allocate costs," but instead were an attempt to "estimate the merchants' willingness to pay for a Mastercard card." *Id.* at 56 n.203 & n.204.  Visa's and Mastercard's ability to succeed in this conduct and profit from it is additional direct evidence of their substantial market power.

-29-

1      *(d)      Enforcement of anticompetitive rules and policies*

2      85.      Visa's and Mastercard's successful enforcement of anticompetitive rules and

3  policies that harmed merchants, ISOs, and PayFacs without losing acceptance or transaction

4  volume further demonstrates the substantial market power that Visa and Mastercard had in the

5  General Purpose Payment Card Transaction Markets.

6      86.      The Honor All Cards rules require that any merchant, ISO, or PayFac that accepts

7  Visa or Mastercard must accept *all cards* of that brand, regardless of the Issuer or level of

8  Interchange Fee.  Visa's and Mastercard's rules also prevent any erosion of Visa's and

9  Mastercard's market power.  By preventing merchants, ISOs, and PayFacs from influencing

10  consumer choice, the anti-steering restraints prevent merchants, ISOs, and PayFacs from reducing

11  the amount of Visa's and Mastercard's network services they purchased based on price.

12      87.      Despite the adverse economic impact of these rules and policies on merchants,

13  ISOs, and PayFacs, given Visa's and Mastercard's substantial market power, merchants, ISOs, and

14  PayFacs could not afford to stop accepting Visa or Mastercard transactions.

15      *(e)      Forcing merchants, ISOs, PayFacs, and consumers to accept*
16      *outdated, less secure products*

17      88.      Throughout the Damages Period, Visa and Mastercard have acted to keep a

18  defective product in place—signature-authenticated cards—in order to maintain their

19  supracompetitive profits that are tethered to this faulty technology.  They did so because using that

20  outdated technology for as long as possible prevented merchants from routing transactions over

21  other networks not owned by Visa or Mastercard (which, in no small coincidence, have lower

22  Interchange Fees), or over less profitable of Visa's and Mastercard's networks.  Visa's and

23  Mastercard's success in forcing merchants, ISOs, PayFacs, and consumers to accept and use

24  technologically-inferior, and in fact defective, products—including products that Visa and

25  Mastercard knew would increase fraud—not only advanced the goals of the conspiracy, but also is

26  further evidence of their substantial market power.

27      89.      Visa and Mastercard could have dramatically reduced General Purpose Payment

28  Card fraud in the United States by adopting new card technology to replace the decades-old, fraud-

-30-

prone "magnetic stripe" and signature-authenticated cards that they forced merchants, ISOs, PayFacs, and consumers to accept and use.  But Visa and Mastercard have maintained the signature-based authentication system, and resisted superior technology, because they profit from the system that comes with this fraud-producing product.

90.     Visa and Mastercard have long recognized that the magnetic stripe technology that their General Purpose Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud-prone.  Indeed, the data on a magnetic stripe can be easily copied (skimmed) with a simple card reading device, which enables criminals to reproduce counterfeit cards or engage in other forms of fraud, such as card-not-present fraud, which involves the unauthorized use of a credit or debit card outside of a face-to-face interaction with a merchant, such as in e-commerce.  Yet Visa and Mastercard perpetuated the use of magnetic stripe technology and delayed taking steps to implement more secure technologies.

91.     As a result, the United States long experienced the highest fraud rates in the world.  For example, the United States was not among the top ten countries with the most counterfeit fraud in 2004 but, by early 2010, it accounted for 85% of total counterfeit fraud among all top ten countries combined.  *See Counterfeit Fraud Migration*, European Payments Council (June 29-30, 2010) at 5-7.  Indeed, Business Intelligence research service found that payment card fraud in the United States increased in 2013 by 29% to $7.1 billion, accounting for 51% of total worldwide card fraud (despite accounting for only about 25% of global payment card volume).

92.     Such extreme levels of payment card fraud can be avoided with the proper use and deployment of chip technology, which Visa and Mastercard declined to introduce in the United States until recently, in combination with PIN verification features.  Instead of implementing these steps, however, Visa and Mastercard succeeded in shifting most of the cost of fraud losses to merchants, ISOs, and PayFacs in this country through the implementation of various compliance programs and liability rules.  They did so because fraud creates a pretextual justification for high Interchange Fees.  Visa and Mastercard also charged punitive fines and fees for data breaches, another manifestation of their substantial market power.

93.     The technology to reduce fraud dramatically is available to Visa and Mastercard. EMV chips have been used in Europe since the mid-1990s.  Unlike payment data stored on a magnetic stripe, which is static or unchanging, each transaction involving an EMV card creates a unique transaction code, which can never be used again.

94.     For this reason, if a criminal were to obtain the transaction information from a particular point of sale from an EMV card, the information would be useless, making counterfeiting EMV cards less fruitful, and leading to a decrease in fraud.  Indeed, after the UK implemented EMV chip payment technology in 2004, the UK reported a 55% reduction in counterfeit fraud and a 33% reduction in lost or stolen card fraud from 2005 to 2013.  Similarly, after Canada implemented use of the EMV technology in 2008, it experienced a 54% decline in counterfeit and lost or stolen card fraud from 2008-2013.  Chase Paymentech, "Preparing for the Transition to EMV Payments" (2015), at 2.

95.     The United States was one of the last countries to migrate to the EMV system. According to EMVCo, 32% of transactions globally used EMV in 2014, including Africa and the Middle East (80% of transactions utilized EMV technology), Canada, Latin America and the Caribbean (85%), and parts of Europe (97%).  Meanwhile, only 0.12% of transactions in the United States used EMV technology during that same time period.

96.     After years of suppression, Visa and Mastercard finally enacted policies to encourage adoption of the EMV standard in the United States.  In August 2011, Visa announced enactment of so-called "liability shift policies," effective October 2015.  Press Release, "Visa Announces Plans to Accelerate Chip Migration and Adoption of Mobile Payments," Aug. 9, 2011, *available at* https://usa.visa.com/about-visa/newsroom/press-releases.releaseId.1594598.html. Mastercard announced a similar policy in January 2012.  According to these policies, if a merchant is presented with a payment card with EMV chip technology, but the merchant has not yet begun using chip-reading terminals, liability for counterfeit fraud shifts away from the card Issuer and instead to the merchant.  According to Mastercard Worldwide's former head of U.S. Product Delivery, Carolyn Balfany, "[i]f a merchant is still using the old system, they can still run a transaction with a swipe and a signature.  But they will be liable for any fraudulent transactions

-32-

if the customer has [used] a chip card."  Verifone, "The U.S. Government Shift to EMV Payments" (2014) at 6.  But upgrading to new chip-reading terminals is a costly endeavor, requiring upgrading or replacing checkout terminals.

97.    And even when Visa and Mastercard finally enacted policies to encourage adoption of the EMV standard in the United States, they did so only in half measure.  Consumers using credit or debit cards usually authenticate their identities in one of two ways:  (i) by entering a PIN, as they do when they withdraw cash from an ATM, or (ii) by signing a paper or electronic receipt.  PIN verification is significantly more secure and less prone to fraud than signature authentication.

98.    The majority of the world's countries use credit and debit cards with EMV chips, and most of those require a PIN for verification in addition to the chip—so-called "chip-and-PIN" cards.  Countries such as Australia, Belgium, Canada, France, and the U.K. use chip-and-PIN cards.  Such cards offer an extra layer of security beyond the chip itself, by requiring the user to enter a four-digit PIN, thereby ensuring that the individual using the card is the card's owner.  Signatures can be copied or forged, and cashiers are not handwriting experts trained to identify forged signatures.

99.    In fact, though consumers likely believe that signatures will be verified in some manner in order to avoid fraudulent charges, Visa discourages merchants from asking customers for a form of identification so they can check the signature because, Visa claims, that might "deter the use of a Visa card and result in the loss of a potential sale," thus "Visa believes merchants should not ask for ID as part of their regular card acceptance procedures."  The member banks likewise do not typically collect verified signatures from cardholders or do anything to guarantee that the signature on the card is itself valid.  Between 2004 and 2010, the fraud rate for debit card transactions verified with a signature was significantly higher than transactions verified by a PIN.  By 2010, signature debit accounted for 91% of U.S. debit fraud.

100.    Despite the fact that signature verification feeds fraud, Visa and Mastercard have pushed for signature verification over PIN because it has significant consequences for how transactions are routed across networks.  If a cardholder enters a PIN to verify his or her identify, then the transaction is routed across a PIN debit network, while if the cardholder signs, the

-33-

transaction is routed across a signature network.  Debit cards typically have the functionality to route transactions across PIN or signature networks.  The network over which a transaction is routed determines the Interchange Fee charged to merchants, ISOs, and PayFacs.  The Interchange Fee on signature transactions is markedly higher than the fee on PIN transactions.  According to data from the Federal Reserve Board, as of 2009, the average Interchange Fee for signature debit was 56 cents per transaction (or 1.53%) while the average fee for PIN debit was just 23 cents (0.56%).

101.    The higher Interchange Fee on signature transactions is a result of the fact that Visa and Mastercard do not have meaningful signature debit competition.

102.    When Visa and Mastercard finally enacted policies to encourage adoption of the EMV standard in the United States, they did so in a way that strongly favors signature over PIN in order to maintain their supracompetitive profits associated with signature verification.

103.    When merchants, ISOs, and PayFacs attempt to promote PIN, they are threatened and punished.  For example, when Walmart implemented a chip-and-PIN protocol at its stores throughout the United States, Visa asserted that Walmart's use of chip-and-PIN was a "material breach" of Walmart's agreement with Visa and threatened to disable its network at all Walmart locations.

104.    Given the lack of a PIN requirement in the United States, card-not-present fraud—such as that which occurs in online payments—may increase.  Notably, shortly before announcing the "liability shift policies," Visa purchased an online fraud mitigation company, CyberSource.  Visa has knowledge that with the failure to implement a PIN requirement, fraud is likely to shift online, resulting in greater demand for the business of companies like CyberSource.

105.    Moreover, as Visa, Mastercard, and the Issuers decline to take available steps to decrease fraud in this manner, they force merchants, ISOs, and PayFacs to bear the cost and responsibility of reducing payment card fraud.  For instance, Visa and Mastercard require merchants to comply with Payment Card Industry Data Security Standards ("PCI" or "PCI DSS").  But maintaining PCI compliance is a costly endeavor for merchants—and one which Visa and Mastercard do not reimburse.

-34-

106.    Despite the availability of technology to reduce fraud, Visa and Mastercard had no incentive to adopt it in the United States or compete on this basis because they could shift fraud-related costs to merchants, ISOs, and PayFacs and thereby profit from fraud while insulating the banks from its costs.  Visa's and Mastercard's ability to impose inferior quality card products and to permit preventable fraud during the Damages Period is further direct evidence of their substantial market power.  To the extent Intuit was forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages that flow from the conspiracies.

107.    Visa's and Mastercard's substantial market power continued, and even increased, during the Damages Period.  Intuit cannot drop Visa or Mastercard General Purpose Credit or Debit Cards without losing an unacceptable number of sales, or an unacceptable number of transactions for its ISO or PayFac customers.

### 6.    The Visa and Mastercard IPOs were changes in corporate form that maintained and enhanced the cartels.

108.    During the Damages Period, the member banks that sat on the Visa and Mastercard boards, and controlled them, approved Mastercard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs.  The member banks took advantage of their direct control over pre-IPO Visa and Mastercard to agree to post-IPO structures for Visa and Mastercard that were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint.

109.    These IPOs were a response to the growing antitrust challenges and adverse legal rulings regarding Visa's and Mastercard's organizational structures as associations of competing member banks.  *See, e.g.*, Mastercard Incorporated Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) at 72-73 (noting that Mastercard had "faced heightened regulatory scrutiny and legal challenges in recent years").

110.    In response to these legal defeats and a host of additional antitrust challenges, Visa and Mastercard, and their member banks, decided to change the organizational structures of Visa and Mastercard in order to attempt to evade antitrust liability through superficial changes in

-35-

corporate form.  But in doing so, the member banks agreed prior to the IPOs that post-IPO Visa and Mastercard would continue to support the agreements not to compete and to fix prices.

111.    They implemented this agreement by structuring the IPOs so that they cosmetically changed the corporate forms, while leaving the anticompetitive conduct intact.  Pre-IPO, the member/owner banks conspired through Visa's and Mastercard's governing boards and/or their ownership of Visa and Mastercard to control every aspect of Visa's and Mastercard's businesses, including agreeing to fix the prices of Interchange Fees through ratification of the "default" Interchange Fee schedules and agreeing to set Visa's and Mastercard's rules, including maintaining the Honor All Cards rules.

112.    On May 22, 2006, Mastercard completed an IPO, which sold a partial interest in Mastercard to public investors.  Through this IPO and related agreements, the surviving entity acquired certain of its member banks' ownership and control rights in Mastercard through the redemption and reclassification of stock that was previously held by the member banks into non-voting "Class B" shares in post-IPO Mastercard.  In addition, the member banks each received a single "Class M" share that allowed them to elect up to 25% of the post-IPO Mastercard board and gave them veto power over certain of post-IPO Mastercard's decisions.  Post-IPO Mastercard financed this acquisition by selling to the public "Class A" shares, which represented a 49% equity interest in post-IPO Mastercard.  The Class B shares that are held by the member banks constitute 41% of the equity interest in post-IPO Mastercard.  A newly-created Mastercard Foundation was given a 10% equity share in post-IPO Mastercard.

113.    On March 19, 2008, Visa completed its own IPO.  Under a series of transactions that culminated in the IPO, Visa U.S.A., Visa International, Visa Canada, and Inovant became subsidiaries of a Delaware corporation known as Visa Inc.  After the subsidiaries were unified in Visa Inc., the stock was acquired in the former members of each subsidiary.  Once the restructuring was completed, Visa Inc. conducted an IPO of over 400,000,000 shares of Class A common stock.  This process was essentially the acquisition by Visa Inc. of certain member banks' ownership rights in Visa through the redemption and reclassification of approximately 270 million shares of Visa stock previously held by the member banks in the form of Class B and

-36-

Class C common stock.  Members of Visa U.S.A. acquired Class B Common Stock; other banks received Class C common stock.

114.    After the IPOs, Mastercard and its member banks, and Visa and its member banks, undertook no acts that were inconsistent with the purposes and goals of their prior collective action, and undertook no conduct that would tend to defeat those purposes, goals, or effects of their prior conduct.  To the contrary, post-IPO, Visa and Mastercard act as the pricing and rules enforcement agents for their member banks.  Through the corporate reorganizations and subsequent IPOs, each member bank effectively delegated to Visa and Mastercard, in perpetuity, the ability to fix the bank's pricing to merchants, ISOs, and PayFacs.  Each member bank knew that all other Visa and Mastercard member banks were also delegating their pricing decisions to Visa's and Mastercard's member banks when they voted to approve Visa's and Mastercard's restructurings on these bases.

115.    Moreover, as part of the corporate reorganizations leading to their respective IPOs, the member banks reaffirmed and effectively readopted each network's rules, including the "default" Interchange Fee and Honor All Cards rules.  Thus, the member banks' approval of this scheme was done knowing that all Visa and Mastercard member banks' Interchange Fees would be set by Visa and Mastercard.  This was a conscious commitment to an ongoing common scheme by horizontal competitors and, as such, is a continuing violation of Section 1 of the Sherman Act.  It maintains the pre-IPO status quo:  Visa and Mastercard continue to set Interchange Fees for thousands of competing banks that, but for these conspiracies, would have independently competed for acceptance.

116.    The IPOs increased the effectiveness of Defendants' price-fixing conspiracies as well as Visa's and Mastercard's substantial market power by consolidating decision-making and coordinating communications among the conspirators.  Visa's and Mastercard's economists opined in 1993—well before these IPOs were being considered—that "[t]here would be far less competition in this industry if Visa and Mastercard had chosen to operate as single companies." David S. Evans & Richard L. Schmalensee, *The Economics of the Payment Card Industry* (1993), at 103.

-37-

117.    Because the banks designed and approved the networks' rules and the networks' restructurings, the networks' conduct was essentially unchanged by the restructurings and the IPOs, so that the anticompetitive effects of these ongoing conspiracies continue to harm merchants, ISOs, PayFacs, and consumers.  The banks continue to adhere to the rules at issue, without exception.  And Visa and Mastercard continue to wield substantial market power over merchants, ISOs, and PayFacs as a result.  In this regard, Visa and Mastercard and the member banks understood before the IPOs were consummated that, if Visa and Mastercard maintained the cartels' basic rule and structures, no bank would break rank and compete for acceptance.  That is precisely what happened.

118.    Defendants' post-IPO conduct confirms that the IPOs did not terminate their price-fixing cartels or reduce Visa's and Mastercard's substantial market power.  Visa's and Mastercard's anticompetitive rules, including the restraints at issue in this Complaint, have remained the same.  Visa and Mastercard have exercised their substantial market power by imposing new network fees that merchants, ISOs, and PayFacs must pay.  Visa has engaged in a campaign to maintain its monopoly power in the General Purpose Debit Card Transaction Market.  Perhaps most significantly, Visa's and Mastercard's Interchange Fees have remained at supracompetitive levels since the IPOs.  This continuity demonstrates that the IPOs perpetuated Defendants' anticompetitive schemes and their substantial market power.

119.    Government antitrust enforcers agree that these IPOs reflected changes merely in corporate form, not substantive conduct.  In 2007, the European Commission's Competition Directorate issued a written determination that Mastercard's members had simply agreed to appoint Mastercard as their cartel manager to act in their collective best interest in setting the level of Interchange Fees.  In particular, the Competition Directorate's comprehensive decision found as follows:

> MasterCard's viewpoint that the IPO . . . had changed the organisation's governance
> so fundamentally that any decision of MasterCard Incorporated's Global Board no
> longer qualifies as [a] decision of an association [of its member banks] but rather as [a]
> "unilateral" act which each member bank bilaterally agrees to abide by, cannot be

-38-

accepted. . . . MasterCard's member banks shaped and eventually approved the IPO in order to perpetuate the MIF [Multilateral Interchange Fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny.  Contrary to MasterCard's argument, the aim of avoiding exposure to antitrust risks due to the MasterCard MIF was a clear driving force behind the IPO.  Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making.  The member banks effectively "*outsourced*" this decision making to a new management body and made sure that their direct influence . . . would be limited to minority rights.  However, the banks also agreed to the IPO . . . .after MasterCard's management assured them that the banks' interests will continue to be preserved under a new 'enhanced customer approach' and via the local input of the banks in the decision making.  *It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the member banks legitimately expected and therefore agreed that this Board would henceforth set the MIF in a manner that is in their common interests*.

European Commission Decision, COMP/34.579, ¶¶ 357, 378-79 (Dec. 19, 2007) (emphasis added).

120.     The fact that a majority of Mastercard's post-IPO directors were "independent" did not change the role of Mastercard as the "outsourced" pricing agent and manager of the members' Interchange Fee cartel:

The circumstance that members of the Global Board are "independent" within the meaning of the NYSE criteria . . . is not a decisive question for there to be an association of undertakings.  As an organisation's members entrust decision making power to a common body with the expectations that the body's subsequent coordination of their competitive behavior will occur in the interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision[s] of an association of undertakings.

-39-

*Id.* ¶ 381.  Moreover, "[d]evelopments after the IPO also indicate that MasterCard's management takes into account concrete banks['] interests in setting the level of fallback interchange fees."  *Id.* ¶ 389.

121.    Even after the IPO, the "decisions of [Mastercard's] management bodies are still binding upon [its] members and no bank can participate in [Mastercard] without complying in all respects with [Mastercard's rules]."  *Id.* ¶ 352.  The Commission also found that the post-IPO Mastercard entity "coordinat[es] the market behavior of the organisation's member banks," by enforcing uniform schedules of "default" Interchange Fees, *id.* ¶ 355, and that the IPO did not change the effect of Mastercard's "default" Interchange Fees, which both before and after the IPO "allow[ the member banks] to exploit [their] collective market power by effectively putting a floor under the [merchant service charge] charged to merchants," *id.* ¶ 522.

122.    In May 2012, the European General Court affirmed the Commission's conclusions:

> [T]he Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by MasterCard's IPO, the MasterCard payment organisation had continued to be an institutionalised form of coordination of the conduct of the banks.  Consequently, the Commission was fully entitled to characterize as decisions by an association of undertakings the decisions taken by the bodies of the MasterCard payment organisation in determining the MIF.

*MasterCard, Inc. and Others v. European Commission*, Case T-111/08, ¶ 259 (May 24, 2012).  "[W]ith regard to merchants, what [Mastercard and its member banks] sought [post-IPO wa]s essentially the maximum threshold of their tolerance to the price of card transactions."  *Id.* ¶ 257.  In September 2014, the European Court of Justice—Europe's top court—likewise upheld the European Commission's decision:

> [T]he General Court considered the existence of a commonality of interests to be relevant in this instance not only on the basis of a theoretical concurrence of the banks' interests and those of MasterCard, but also having taken into account, in its definitive assessment of the facts, specific factual circumstances . . . including . . . the fact that it was undisputed that MasterCard was acting in the interests of the banks before the

-40-

IPO; secondly . . . the developments after the IPO which indicate that that organisation is, in reality, continuing to take into account concrete banks' interests in setting the level of the MIF; and thirdly . . . the fact that the interests of MasterCard's shareholders do not conflict with those of the banks.  In those circumstances, it was open to the General Court to find . . . that both the banks' residual decision-making powers after the IPO on matters other than the MIF, and the commonality of interests between MasterCard and the banks, were both relevant and sufficient for purposes of assessing whether, after the IPO, MasterCard could still be considered to be an 'association of undertakings', within the meaning of Article 81 EC. . . . [T]he undertakings in question pursued, over several years, the same objective of joint regulation of the market within the framework of the same organisation, albeit under different forms.

*MasterCard, Inc. and Others v. European Commission*, Case C-382/12 P, ¶¶ 71-76 (Sept. 11, 2014).  In July 2015, the European Commission sent an additional Statement of Objections to Mastercard, the result of a two-year investigation started in April 2013, outlining the Commission's view that certain additional categories of Interchange Fees and rules limit competition, and lead to excessive Interchange Fees.  On the basis of that investigation, the European Commission fined Mastercard €570 million in 2019, for anticompetitive practices.

### 7.     Defendants' price-fixing schemes also are unlawful price constraints.

123.     The Interchange Fee price-fixing schemes adopted by Defendants also constituted anticompetitive and unreasonable price restraints.  Visa and Mastercard entered into express agreements with each of their member banks, binding all of their member banks to comply with the rules and regulations of their networks, including the rules at issue in this Complaint.  In turn, Visa and Mastercard each acts as the enforcement agent and holds Issuing and Acquiring members responsible for compliance with the rules.  These two sets of price restraints—one for Visa and its member banks, and the other for Mastercard and its member banks—continued in full effect during the Damages Period, including after Visa's and Mastercard's IPOs.

-41-

124.    For example, Rule 1.3 of the July 15, 2011 *MasterCard Rules* states:  "[a]n applicant to be a Member must agree, and by execution and submission of an application to be a Member agrees, that it will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation."  In turn, "Standards" is defined as:  "[t]he Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the operating regulations and procedures of the Corporation, including but not limited to any manuals, guides or bulletins, as may be amended from time to time."  *See* Definitions, *MasterCard Rules* (July 15, 2011).  Similarly, the "General Overview" of the October 15, 2010 *Visa International Operating Regulations* states:  "[t]he *Visa International Operating Regulations* are set and modified by Visa to support the use and innovation of Visa products and services, and represent a binding contract between Visa and all Members."

**B.    Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without Justification**

125.    Defendants have argued over the years that Interchange Fees are cost-based and necessary mechanisms to reimburse Issuers to motivate them to issue General Purpose Payment Cards.  The facts show otherwise.

126.    General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally.  Payment card networks can thrive without Interchange Fees, and can similarly thrive with competition for merchant acceptance such that the competition disciplines Interchange Fee-setting practices.  Moreover, the Interchange Fees set by Defendants are not based on cost.  Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Complaint.

**1.    Banks would profit from issuing General Purpose Debit Cards even without collectively-set Interchange Fees.**

127.    General Purpose Debit Cards have long been positioned by Visa and Mastercard and the banks as a replacement for cash and checks, both of which have cleared "at par" (*i.e.*, zero interchange) for decades.  As such, Issuers have strong economic incentives to issue General Purpose Debit Cards even without income from Interchange Fees.  General Purpose Debit Cards

-42-

provide numerous economic benefits to Issuers that justify their issuance even without Interchange Fees.  These benefits include:  (1) savings relative to the cost of processing checks and cash; (2) motivating cardholders to maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuer to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards.  Moreover, issuance of General Purpose Debit Cards enhances the "stickiness" of the Issuer's valuable relationship with its customers.

128.     When banks first began to offer PIN Debit Cards in the United States, they did not charge Interchange Fees.  To the contrary, they sometimes even *paid* merchants to provide debit services, a practice known as "reverse," "negative," or "Issuer-paid" interchange.  Other banks provided debit services at par.  The General Purpose Debit Card Transaction Market expanded substantially during the time of Issuer-paid and at-par interchange.  This model prevailed until the early 1990s, when it changed only because Visa and Mastercard extended their cartels into debit.

129.     Beginning in the early 1990s, Visa and Mastercard aggressively began to implement and enforce a strategy to leverage their substantial market power in the General Purpose Credit Card Transaction Market and force merchants and other entities to pay supracompetitive General Purpose Debit Card Interchange Fees.  The linchpin of this strategy was the enforcement of "credit/debit tying rules" which, until January 1, 2004, forced merchants and other entities that accepted Visa's and Mastercard's dominant General Purpose Credit Cards to also accept the networks' Signature Debit Card transactions.  Visa and Mastercard set the same or similar Interchange Fees for General Purpose Credit Card and Debit Card transactions notwithstanding the different costs and demand characteristics of such transactions.  Merchants and other entities had no choice but to accept Visa's and Mastercard's dominant, supracompetitively-priced General Purpose Credit Card products and were, therefore, forced to accept supracompetitive Signature Debit Card Interchange Fees.

130.     Visa and Mastercard then used the lucrative Interchange Fee stream created by this practice to induce additional Issuers to participate in the conspiracy and thereby entrench their dominance in the General Purpose Debit Card Transaction Market.  This strategy successfully destroyed the at-par interchange model that had prevailed for debit prior to the 1990s, as Visa and

-43-

Mastercard had intended.  Moreover, it distorted banks' incentives in debit, causing them to push the less secure, less efficient Signature Debit Card products of Visa and Mastercard and to suppress the safer, cheaper, and faster PIN Debit Card products that were being promoted by the competing PIN Debit Card networks, such as Pulse and STAR.

131.    The substantial non-interchange economic benefits of issuing General Purpose Debit Cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on General Purpose Debit Card Interchange Fees in the United States pursuant to the Durbin Amendment discussed above.  Addressing that impending regulatory cap, the CEO of Citigroup said:  "We don't have much of an impact on debit card interchange or . . . overdraft fees, those are really small impacts on us."  Citigroup Inc. Q4 Earnings Call Transcript (Jan. 18, 2011).  The Chairman and CEO of City National Corporation predicted:  "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material."  City National Corporation Q4 2010 Earnings Call Transcript (Jan. 20, 2011).  TCF Financial Corp.'s Chairman and CEO added that "[w]e'll obviously still be profitable" even if there is a cap imposed on debit Interchange Fees.  *TCF Discusses Lawsuit Challenging Durbin Amendment* (Oct. 12, 2010), at 7.

132.    The fact that General Purpose Debit Card issuance continues to be profitable, and that debit volumes have increased since General Purpose Debit Card Interchange Fees for regulated banks declined significantly beginning in late 2011, reinforce the conclusion that General Purpose Debit Card Interchange Fees had been fixed at supracompetitive levels throughout the Damages Period.

133.    The experience in other industrialized countries also highlights that the development of debit in the United States, with cartel-determined supracompetitive Interchange Fees, was a function of anticompetitive conduct in the General Purpose Debit Card industry in this country.  Virtually all the countries with the highest debit usage—including Canada, Denmark, Finland, Iceland, the Netherlands, New Zealand, and Norway—utilize an at-par interchange pricing model.  For example, the Canadian debit system has always been based on at-par pricing, and Canada has traditionally had higher per capita debit usage than the United States, as well as

-44-

higher debit penetration in merchant categories that do not accept PIN Debit Cards in the United States.

134.    The vast and successful U.S. checking system also demonstrates that Interchange Fees are not necessary for a General Purpose Debit Card Network to function.  Since 1916, by rule of the Federal Reserve, trillions of dollars of checks drawn on the U.S. national banking systems have cleared at par.  Despite this prohibition on Interchange Fees, banks have continued to offer checks to their customers and have continued to accept and cash checks issued by other banks.

**2.      Banks would profit from issuing General Purpose Credit Cards even without collectively-set Interchange Fees.**

135.    The Visa and Mastercard networks could function efficiently without fixed Interchange Fees and/or other restraints.  In the 1980s, the "default" Interchange Fee rules were rationalized as being necessary to give General Purpose Credit Card Issuers incentives to issue such cards.  By 1990, it was apparent that General Purpose Credit Card Issuers were earning substantial profits from interest rates on revolving balances and annual fees, and therefore Interchange Fees were unnecessary to encourage General Purpose Credit Card issuance.  Since then, the evidence has continued to show that General Purpose Credit Card Issuers can be profitable without collectively-set Interchange Fees.

136.    International experience regarding Interchange Fees on General Purpose Credit Card transactions also indicates that Interchange Fees in the United States have been fixed at supracompetitive levels.  In Australia, the Reserve Bank of Australia ("RBA") extensively investigated the domestic Australian payment card industry.  In 2002, as a result of that investigation, the RBA ordered Visa and Mastercard to reduce their domestic Interchange Fees by nearly 50% (to an average of 50 basis points), rates that are much lower than those that have prevailed in the United States during the Damages Period.

137.    Prior to enactment of these regulations, Visa and Mastercard argued that such a reduction in Interchange Fees would cause a "death spiral" that would lead to a collapse of their networks and upheaval in the industry.  In reality, no such "death spiral" or collapse occurred. Visa's and Mastercard's General Purpose Credit Card volumes have *increased* in Australia since

-45-

the regulations went into effect. Indeed, the European General Court recently reviewed the evidence from Australia and concluded: "[i]t is clear . . . that a substantial reduction in the Mastercard system's interchange fees that was imposed by the Reserve Bank of Australia had no notable impact on the system's viability . . ." *MasterCard, Inc. and Others, European Commission*, Case T-111/08, ¶ 111 (May 24, 2012).

138. Similarly, the European Commission undertook a comprehensive study of General Purpose Credit Card Interchange Fees in Europe, and its Competition Directorate undertook antitrust investigations into Interchange Fees charged by Mastercard's and Visa's European affiliates. In 2002, the Commission and Visa reached a settlement that lowered Interchange Fees first to 0.7%, and then to a cost-based standard if lower. This commitment expired in 2007, and the Commission began a new investigation.

139. Following Visa's 2002 commitment to limit consumer General Purpose Credit Card Interchange Fees to 0.7%, Visa Europe announced in May 2013 that it will limit Interchange Fees to 0.3%. In 2007, the Commission found Mastercard's setting of Interchange Fees to be unlawful, and Mastercard agreed to cap its Interchange Fees for transactions crossing national borders at 0.3% during the pendency of its appeal of that decision. For years, therefore, the resulting European Interchange Fees have been substantially below those that prevail in the United States that often exceed 2.00% due to the proliferation of Premium Payment Cards. Again, there have been no adverse effects—Visa's and Mastercard's General Purpose Credit card volumes in Europe have increased during this period.

140. Similarly, in 2005, the Office of Fair Trade ("OFT")—the antitrust-enforcement body in the U.K.—concluded after a four-year investigation that Mastercard's domestic Interchange Fees violated the U.K.'s counterpart to Section 1 of the Sherman Act. In addition to finding that Mastercard had market power in the relevant markets for payment card issuance, acquisition and a "wholesale" market, the OFT also found that the Interchange Fee was used to extract extraneous costs, *i.e.*, those not necessary to the functioning of a payment card network. Visa and Mastercard in the United States often hold up two of the very "extraneous costs" the OFT identified—the cost of "rewards" and the cost of the interest-free "float" period—as

-46-

examples of costs that justify the imposition of uniform schedules of Interchange Fees on merchants, ISOs, and PayFacs.

141.    In neither Australia nor the European Union do Visa and Mastercard enjoy the economies of scale and scope associated with the much larger General Purpose Payment Card Transaction Markets in the United States.  Visa's and Mastercard's General Purpose Credit Card Interchange Fees in the United States are *higher* than nearly every other General Purpose Credit Card Network outside the United States, including Visa's and Mastercard's own networks in other countries.

142.    The costs associated with issuing Visa and Mastercard General Purpose Credit Cards have declined dramatically since 1990.  Issuer costs of funding a cardholder's grace period—known as float costs—have fallen significantly.  Visa and Mastercard General Purpose Credit Card Issuers have enjoyed additional savings from substantial decreases in hardware, processing, and telecommunications costs, as well as through economies of scale that have resulted from vastly-increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

143.    Notwithstanding these declines in Issuer costs, however, Visa and Mastercard have substantially raised their Interchange Fees.  For example, Visa has raised the Interchange Fees and/or cost of acceptance that apply to Visa General Purpose Credit Card transactions throughout the Damages Period.  Mastercard has done the same.  This demonstrates that Interchange Fees are not based on costs, but rather are a cartel's anticompetitive exercise of market power.

144.    Visa and Mastercard have argued that "default" Interchange Fees are justified because, as a result of their Honor All Cards rules, an individual Issuer could otherwise potentially "hold up" merchants, ISOs, and PayFacs that accept Visa's and Mastercard's General Purpose Payment Cards by charging as high an Interchange Fee as the Issuer wishes.

145.    This "hold up" problem is the result of the banks' anticompetitive agreements not to compete for acceptance, *i.e.*, the Honor All Cards rules.  Attempting to justify Interchange Fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as

-47-

Defendants have sought to do, is perverse.  Price fixing in tandem with an agreement not to compete is not a justification for anticompetitive conduct.  It *is* anticompetitive conduct.

146.     Moreover, these schemes create a staggering amount of anticompetitive harm. Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive problem created by the schemes themselves) was credited as a procompetitive benefit—which it should not be—any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Complaint.

**3.      Anti-steering rules hide the costs of Visa and Mastercard transactions from consumers, thereby inhibiting competition from other networks and reinforcing the Visa and Mastercard cartels.**

147.     In a competitive world, some merchants, ISOs, and PayFacs could have used financial incentives and marketing to steer customers to other networks or forms of payment and, by increasing customers' price sensitivity to Interchange Fees, steering could have led to network competition.  Visa and Mastercard prevented this from happening by enforcing anti-steering rules that prohibited merchants from making the cost of Visa and Mastercard transactions transparent to consumers and from making consumers who use the cards bear the associated costs.

148.     During the Damages Period, the anti-steering rules included Visa's and Mastercard's rules that prohibited merchants from offering discounts to consumers that used General Purpose Payment Cards that were less expensive than Visa or Mastercard General Purpose Payment Cards.  These rules remained in effect until Visa and Mastercard revised them to permit such discounting pursuant to a July 20, 2011 consent decree they entered into with the Antitrust Division.  Visa and Mastercard, however, still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment, including one bank's Visa or Mastercard General Purpose Payment Cards instead of more expensive Visa or Mastercard General Purpose Payment Cards issued by other banks.  Such discounting by Visa or Mastercard Issuers would force Visa and Mastercard member banks to compete for acceptance.

149.     The anti-steering restraints also include rules that prevented (and still prevent) banks from linking to multiple networks on General Purpose Credit Cards.  Because of the way

-48-

the General Purpose Debit Card industry developed, with most cards originating as ATM/PIN Debit Cards, General Purpose Debit Cards have long had multiple network linkages (or "bugs") on them, and that has facilitated the most effective form of steering for merchants—routing transactions to cheaper General Purpose Payment Card Networks.  There is no technical reason why multiple network functionality could not co-reside on General Purpose Credit Cards.  Visa and Mastercard rules, however, blocked that from happening throughout the Damages Period.

150.    The anti-steering restraints also include the rules that prevent merchants that accept Visa and Mastercard from testing differential acceptance or new ways to steer transactions to cheaper General Purpose Payment Card Networks at certain locations that operate under a single banner.  That is the way most merchants pilot new products, and such testing would have enabled merchants to introduce new ways to force the banks to compete for acceptance.

151.    The anti-steering rules also included Visa's and Mastercard's prohibitions against surcharging their transactions.  Visa's previous no-surcharge rule provided that "[a] Merchant must not . . . [a]dd any surcharge to [t]ransactions."  *See, e.g.*, Rule 5.2.F, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008).  Mastercard's previous no-surcharge rule similarly provided that "[a] Merchant must not directly or indirectly require any [Mastercard] Cardholder to pay a surcharge or any part of any Merchant discount . . . ."  *See, e.g.*, Rule 5.9.2, *MasterCard Rules* (Feb. 2008); Rule 5.11.2 *MasterCard Rules* (May 2010) (same).  These rules prohibited merchants from surcharging cardholders who use their higher-priced premium card rather than their lower-priced standard card, and eliminated any incentive for Visa, Mastercard, or any Issuing Bank to charge a lower Interchange Fee, because such fees will not be visible to consumers.

152.    As of January 27, 2013, as part of their obligations under the class settlement granted final approval on December 13, 2013 in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 05-md-1720, Mem. and Order (E.D.N.Y. Dec. 13, 2013), Visa and Mastercard made minor alterations to their No Surcharge rules in order to permit merchants to surcharge credit card customers under limited circumstances until July 20, 2021.  (Definitive Class Settlement Agreement ¶¶ 42, 55.)  Even as modified, however, the No

Surcharge Rules, for example, prohibit a merchant from surcharging based on the identity of the card Issuer, and debit card transactions still may not be surcharged.

153. There were no procompetitive justifications for these anti-steering rules. If those paying Interchange Fees had not been restrained by these rules, some of them could have played Visa and Mastercard or the banks against one another by steering or threatening to steer customers away from using more expensive Visa and Mastercard General Purpose Payment Cards. Were it not for the restraints, those paying Interchange Fees could have used such tactics to try to negotiate more favorable terms from Visa or Mastercard or from individual Issuers. As a result, the anti-steering rules, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

**C.     Visa and Its Member Banks Engaged in Additional Anticompetitive Conduct That Monopolized, or Attempted to Monopolize, the General Purpose Debit Card Transaction Market**

154. Visa and Visa's member banks' anticompetitive conduct has not been limited to the Interchange Fee price-fixing cartels detailed above. Visa and Visa's member banks engaged in additional conduct to exclude competition with the purpose and effect of giving Visa a monopoly in the General Purpose Debit Card Transaction Market. This included conduct occurring during the Damages Period, such as dedication agreements between Visa and Issuers of Visa General Purpose Debit Cards and the imposition of fixed network fees to blunt competition in the General Purpose Debit Card Transaction Market.

155. These exclusionary acts have continued to suppress competition in the General Purpose Debit Card Transaction Market, and thereby have enabled Visa and its member banks to charge higher Interchange Fees and Visa to charge higher network fees than they otherwise would have been able to charge merchants, ISOs, and PayFacs.

> **1.     Visa's strategy to maintain its monopoly power in the General Purpose Debit Card Transaction Market.**

156. At or around the time the Damages Period began, Visa possessed monopoly power in the General Purpose Debit Card Transaction Market. Its share of that market was

-50-

approximately 60%, as it comprised 80% of the Signature Debit Card segment and was increasing its PIN Debit Card share through deals with the largest Issuers of Visa General Purpose Debit Cards. By early 2004, Visa had entered into long-term dedication agreements with most of its large Issuers that "prevent[ed] Visa banks from switching to MasterCard" which, at the time, was the only other Signature Debit Card network. *United States v. Visa U.S.A. Inc.*, No. 98-cv-7076(BSJ), 2007 WL 1741885, at *2 (S.D.N.Y. June 15, 2007). Accordingly, Visa "essentially lock[ed] up 89% of the volume of its top 100 debit Issuers." *Id.* at *1. Those deals and the installed base of Visa- and Interlink-branded General Purpose Debit Cards enabled Visa to maintain its monopoly power even after it was forced to relinquish the tying rule by the antitrust settlements in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.).

157. By 2005, Visa's Interlink became the leading PIN Debit Card network with 36% of that segment of the General Purpose Debit Card Transaction Market. Visa maintained that position in PIN Debit, along with its dominant position in Signature Debit, throughout the Damages Period. It did so through various deals with debit Issuers. These deals, entered on exclusive or near-exclusive terms, made Visa's Interlink the exclusive or primary PIN Debit Card acceptance mark on well over 100 million debit cards. These deals gave Visa the power to raise Interlink's Interchange Fees because, even if a merchant tried to drop Interlink and its high rates, the merchant would pay more as transactions defaulted to the still-pricier Visa Signature Debit Card rates. There were no other options on many Visa General Purpose Debit Cards. This exclusivity on many such cards remained intact until April 2012, when Federal Reserve regulations mandated that General Purpose Debit Card Issuers put a competing network's functionality on their debit cards.

158. Visa used its monopoly power to suppress PIN Debit during the Damages Period. As Visa continued to drive up Interlink Interchange Fees, the competing PIN Debit Card networks raised their rates to maintain volume in a market that had long been dominated by Visa. The result was the convergence of PIN Debit Card and Signature Debit Card rates at high *ad valorem* prices, a trend that contributed significantly to the suppression of PIN Debit Card acceptance in the

-51-

United States, a longstanding Visa objective.  With Signature Debit Card and PIN Debit Card Interchange Fees coming into alignment, willingness to install PIN pads to accept PIN Debit Cards was materially reduced.  In PIN Debit alone, in large part because of Visa's conduct, payors faced market-wide effective Interchange Fee increases of an estimated 234% between 1998 and 2006.

## 2. Visa's strategy to maintain its monopoly power in the General Purpose Debit Card Transaction Market, post-Durbin.

159.    By 2010, when Congress passed the Durbin Amendment, Visa's monopoly power in the General Purpose Debit Card Transaction Market rested primarily on two anticompetitive prongs—the greater Interchange Fees associated with Signature Debit than PIN debit (which buttressed Visa's leading position in Signature Debit) and Visa's exclusive (Signature and/or PIN Debit) deals with many of the largest debit Issuers.

160.    The Durbin Amendment threatened both for two reasons.  First, the regulations the Federal Reserve promulgated regarding General Purpose Debit Card Interchange Fees eliminated the distinction between Signature and PIN Debit for the large regulated Issuers that supported the dominance of Visa Check, Visa's Signature Debit product.  Second, the Durbin Amendment repealed Visa's exclusive deals with Issuers by requiring that all General Purpose Debit Cards bear an unaffiliated network on each card.  That requirement subjected Visa to potential competition to reduce Interchange Fees and network fees to win routing decisions.  Many commentators observed that Visa could lose significant portions of its volume, and at least one concluded that up to 80% of its PIN Debit volume was at risk.

161.    Visa responded by implementing a fixed fee known as the Fixed Acquirer Network Fee ("FANF") effective April 2012, which applies to the acceptance of Visa-branded products and is based on the size and number of the merchant's locations.  The FANF is effectively a fee merchants, ISOs, and PayFacs must pay to be a part of the Visa network.  This new fee is nothing more than a creative and anticompetitive mechanism for penalizing merchants, ISOs, and PayFacs for routing debit transactions over any rival debit network.

162.    If a merchant, ISO, or PayFac accepts any Visa General Purpose Payment Card transactions, credit or debit, it must pay this fixed fee to "access" Visa's networks and, perversely,

-52-

the more locations the merchant operates, the greater the fee it has to pay.  This construct restores the tie between General Purpose Debit Card acceptance and General Purpose Credit Card acceptance that Visa previously utilized as the linchpin of its strategy to dominate the General Purpose Debit Card Transaction Market.  It does so because the only way merchants, ISOs, and PayFacs can avoid the fee is to drop all Visa products; and the only way merchants, ISOs, and PayFacs can mitigate the fee is to route their General Purpose Debit Card volume to Visa.

163.    The FANF further penalizes a merchant, ISO, or PayFac for routing a transaction over a competing PIN Debit network because, if the merchant, ISO, or PayFac did that, then it would not be able to reduce its fixed fee by shifting volume to Visa.  In fact, because the merchant, ISO, or PayFac must pay Visa's fixed fee whether it routes the transaction to Visa or not, the merchant, ISO, or PayFac will, in effect, pay twice for transactions routed over competing PIN debit networks—an up-front payment to Visa simply to be a part of the Visa network, and a second payment to a competing PIN debit network for any particular transaction not routed to Visa.

164.    Visa uses the FANF to maintain its monopoly power by compromising the PIN Debit networks' ability to compete and neutralizing the competitive dynamic the Durbin Amendment was intended to introduce.  While Visa leveraged its power in the General Purpose Credit Card Transaction Market to distort competition in the General Purpose Debit Card Transaction Market with the FANF, the rival PIN Debit networks cannot do that.  If they tried to implement such a fee, merchants, ISOs, and PayFacs would stop accepting their General Purpose Debit Cards.  Visa has maintained its monopoly power, not because it has better General Purpose Debit Card Networks, but because it has the power to use a tying arrangement and an anticompetitive fixed fee to foreclose competition.

165.    Visa and Mastercard have also used consumers' lack of sophistication to circumvent the Durbin Amendment's goal of providing merchants, ISOs, and PayFacs with routing choice.  As noted above, for example, Visa has programmed EMV terminals to offer consumers a choice between "Visa debit" and "U.S. debit."  Visa did this because it knows that, since most consumers are not aware that "U.S. debit" refers to more economical PIN debit

-53-

networks (as opposed to Visa's and Mastercard's more expensive signature debit networks), consumers are inclined to select Visa—even when merchants, ISOs, and PayFacs would prefer that consumers choose other less expensive options.

166.    Industry analysts recognized that Visa's conduct was likely to severely foreclose competition from PIN Debit Card networks and cement Visa's market power:

- "Tapping the entire Visa customer base to subsidize aggressive PIN-debit pricing should significantly boost Interlink's market share, possibly above today's exclusivity-driven levels.  This aggressive approach is clearly bad news for competing PIN-debit networks as they simply won't be able to match price with post-Durbin Visa."  *See* Chris Brendler *et al.*, "New Fee Structure; Near-Term Pain, Long-Run Gain," *Stifel Nicolaus* (Aug. 1, 2011) at 3.

- "In our view, the [FANF], once established, should actually increase Visa's long-run pricing power since merchants will have little ability to deter future price increases . . . [W]e think this fee gives Visa enormous long-run pricing power as there are few governors on future price increases . . . Over time, we think Visa near-term margin sacrifice will be easily offset by market share gains and additional pricing power."  *Id.* at 1, 3.

167.    As a result of this conduct, Visa's share of the General Purpose Debit Card Transaction Market remains at monopolistic levels and is poised to increase; and its ability to impose supracompetitive and economically unjustified fixed network access fees reflects its continuing monopoly power.

168.    More recently, Visa has announced new fees designed to punish Issuers that would consider undercutting Visa's power in the debit market by allowing or encouraging merchants, ISOs, and PayFacs to route to lower-cost PIN networks.

169.    Visa gave this new fee the cryptic name "Delayed De-Conversion Assessment" ("DDCA"), and stated it would be imposed on Issuers that experience "sustained material decline in Visa payment volume or card counts" or demonstrate "an intent to change business status or network affiliation."  In other words, if an Issuer dared to take steps that might allow a merchant,

-54-

1   ISO, or PayFac to route Visa-branded card transactions to a non-Visa network, the Issuer would be

2   punished with higher fees.

3          170.   In June 2016, Senator Dick Durbin wrote a letter to Visa denouncing the DDCA,

4   and noting its anticompetitive effects:  "Simply put, Visa appears to be imposing a significant

5   penalty on card issuers that try to shift their business from Visa to a competing card network or

6   that see their business shifted to competing networks through market forces."  Senator Durbin

7   explained that his "amendment [the Durbin Amendment] has worked to enhance competition

8   between card networks and preserve the ability of small banks and credit unions to compete fairly

9   in the card issuance market," and that "Visa's new fee could diminish competition between

10  networks and penalize small banks and credit union issuers."  Under pressure, Visa indicated it

11  was not planning any longer to impose the DDCA.  But Visa had already made clear its intent and

12  ability to punish Issuers that threaten Visa's market dominance by supporting PIN debit.

13         171.   Notably, and indicative of the ongoing coordination between Defendants,

14  Mastercard acted in parallel fashion to Visa's announcement of the DDCA fee by adding its own

15  anti-routing penalties.  Mastercard stated it was increasing its "volume assessment" from 0.2 to 3

16  bps—*a fifteenfold increase*—effective July 2016.  As with Visa's fee, this "volume assessment"

17  punishes Issuers if transactions initiated with a Mastercard-branded card are routed to an

18  alternative network.

19         172.   As a result of Visa's and Mastercard's conduct, Issuers will be averse to

20  incentivizing the use of low-cost PIN networks on their issued debit cards or otherwise allowing

21  merchants, ISOs, and PayFacs to route debit transactions over alternative networks.  While Visa

22  and Mastercard had previously ensured Issuer compliance with the carrot of inflated interchange,

23  they now ensure Issuer compliance with the stick of "volume assessments" or threatened "Delayed

24  De-Conversion Assessments."

25         173.   Visa's monopoly power in the General Purpose Debit Card Transaction Market is

26  protected by high barriers to entry.  To be a viable payment network competitor, a potential entrant

27  would need both (1) widespread, if not ubiquitous, acceptance, and (2) large-scale distribution to

28  consumers through Issuers.  While each poses a formidable barrier in its own right, the economic

-55-

reality is that a new entrant must clear both barriers simultaneously.  Merchants, ISOs, and PayFacs are generally unwilling to accept a payment card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a payment card brand that is not widely accepted by merchants, ISOs, and PayFacs.  Therefore, starting a new network, whether debit or credit, with sufficient scale to challenge Visa or Mastercard is extremely difficult.  These high barriers to entry, coupled with the entrenched dominance of Visa and Mastercard, explain in large part why no meaningful entry has occurred in the General Purpose Payment Card Transaction Markets since Discover entered more than three decades ago in 1985.

174.    The Antitrust Division highlighted this structural barrier to entry in the context of the General Purpose Credit Card Transaction Market in its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and Mastercard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, Dkt. No. 5 (E.D.N.Y. Oct. 4, 2010):

> Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market.  Barriers to entry and expansion include the prohibitive cost of establishing a physical network over which General Purpose Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders.  Defendants, which achieved these necessities early in the history of the industry, hold substantial early-mover advantages over prospective subsequent entrants.  Successful entry today would be difficult, time consuming, and expensive.

*Id.* at 7.

## ANTITRUST INJURY

175.    Defendants' price-fixing cartels and Visa's monopolistic conduct have caused substantial and ongoing anticompetitive harm to direct purchasers of General Purpose Payment Card Network Services in the form of inflated Interchange Fees and network fees paid directly by those merchants, ISOs, and PayFacs; foreclosure of network competitors (including new card networks and payment and business models); and reduced output and quality.  Direct purchasers

-56-

of such services (*e.g.*, Intuit) and their customers have borne—and continue to bear—the brunt of hundreds of billions of dollars of supracompetitive fees and severely decreased consumer welfare.

176.     Intuit has suffered direct antitrust injury from Defendants' conduct in violation of the antitrust laws set out above.  During the Damages Period, Intuit was required to pay and paid the applicable Interchange Fee and network fees with respect to transactions in which consumers used a Visa or Mastercard General Purpose Payment Card as the method of payment for a service or product Intuit sold to them, and also those transactions for which it acted as ISO or PayFac for a merchant customer in which a consumer used a Visa or Mastercard General Purpose Payment Card as the method of payment for product(s) purchased from the merchant.  As a result, Intuit directly paid (and continues to directly pay) substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Complaint.  Intuit also was (and continues to be) deprived of the benefits of competition limited by this conduct in the relevant markets.

177.     Intuit has paid billions of dollars in such fees, as well as network and other fees, since the start of the Damages Period.

178.     The imposition of supracompetitive Interchange Fees and network fees distorted Issuer incentives in the markets, perpetuating the fraud-prone magnetic strip system in the United States.  These supracompetitive Interchange Fees and Visa and Mastercard's rules also blocked opportunities for welfare-enhancing collaborations between issuers and merchants, ISOs, and PayFacs.  For example, while discussing ChaseNet—JP Morgan Chase's hybrid closed-loop network, offering lower transaction processing costs and other value-added services—Visa's CEO Charles Scharf acknowledged that Visa's rules hinder issuer competition for acceptance.  During a May 2013 earnings call, he explained:  "The reality is I think if you go around and talk to most issuers, they would probably say that there wasn't a lot of conversation that went on between issuing and acquiring side, partially because our rules that stood in the way of them working together to do something positive for the merchant."  Visa U.S.A. Inc. Q2 2013 Earnings Call Transcript.  This diminution of innovation is a further harm to competition.

-57-

# RELEVANT MARKETS

179.    For the reasons discussed previously, the General Purpose Credit Card Transaction Market and General Purpose Debit Card Transaction Market each constitute distinct markets for antitrust analysis.

180.    Visa and Mastercard exercise substantial market power in the General Purpose Credit Card Transaction Market.  As outlined above, Visa and Mastercard collectively account for over 70% of transaction volume for General Purpose Credit Cards in the United States.  Combined with the significant entry barriers facing potential new, competing payment networks, this cardholder penetration gives Visa and Mastercard power to control prices or exclude competition across their credit card payment platforms.  Visa and Mastercard's ability to raise interchange fees net of any cardholder rewards without losing significant transaction volume in General Purpose Credit Cards is direct evidence of their market power.

181.    Visa also exercises monopoly power in the General Purpose Debit Card Transaction Market.  As outlined above, Visa has demonstrated its ability to control prices or output by profitably raising interchange fees net of any cardholder rewards for its debit products, and continuing to market its inferior, fraud-prone Signature Debit products.  As with General Purpose Credit Cards, this ability to raise interchange fees net of any cardholder rewards without losing acceptance or transaction volume—or improving product quality—is directly probative of its monopoly power across the General Purpose Debit Card payment platform.

182.    Defendants' price fixing and Visa's monopolization have reduced total output by raising net prices to Visa and Mastercard customers and by resulting in products of decreased quality.  As outlined above, Visa and Mastercard's market power have allowed them to impose supracompetitive interchange fees on merchants, ISOs, and PayFacs—fees that are not wholly passed on to cardholders in the form of reward programs.  These bloated fees have forced merchants to raise retail prices above what they would charge if competition existed in the network services industry, and ISOs and PayFacs to raise fees to their merchant customers above what they would otherwise charge.  The net result is fewer sales for Intuit and higher costs to consumers.

183.     This reduced cardholder purchasing power, in turn, reduces total output—*i.e.,* the quantity of credit and debit card purchases—below the competitive level.  Some Visa and Mastercard cardholders do get discounts from these higher retail prices in the form of cardholder rewards.  But they also experience net harm from Defendants' anticompetitive conduct, since their "rewards" do not completely offset the harm experienced from these inflated prices.

184.     Visa and Mastercard cardholders would enjoy equal or greater cardholder rewards absent Defendants' price fixing and Visa's monopolization.  High interchange fees are not necessary to fund competitive cardholder reward programs.  Given the miniscule cost of transaction processing today, issuers pocket most of the interchange revenue as increased profits rather than distributing it in the form of rewards.  Reducing supracompetitive interchange fees might reduce issuing banks' profit margins but it would not necessarily detract from the quality or quantity of cardholder reward programs.  Rather, declining issuer profits would benefit cardholders by prompting banks to explore new reward programs and opportunities for collaboration with other stakeholders.

185.     Defendants' price fixing and Visa's monopolization have also harmed Visa and Mastercard cardholders by increasing fraud losses.  Visa and Mastercard's adherence to a magnetic-stripe-based payment card system well after the emergence of EMV chip cards exemplifies this consumer harm.  Visa has even acknowledged that magnetic-stripe cards— technology that both it and Mastercard endorsed for years after more secure EMV chip technology hit the market—exposed the U.S. payment system to unnecessary and avoidable counterfeit fraud. *See* Answer & Counterclaims of Visa U.S.A. Inc., Doc. No. 28 at 24, ¶ 35, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.* Index No. 652530/2016 (Sup. Ct. N.Y. Cnty. June 29, 2016).

186.     Defendants' price fixing and Visa's monopolization have also harmed cardholders by stunting innovation and reducing cardholder choice.  For example, as described above, Visa CEO Charles W. Scharf admitted that Visa's rules "stood in the way of [issuing banks] working together to do something positive for the merchant" during an earnings call in May 2013.  These foregone opportunities for merchant-issuer collaboration and innovation have also harmed cardholders.  Absent Visa and Mastercard's unlawful restraints, enhanced competition would

-59-

prompt issuing banks to further differentiate their products and services to add value and retain cardholders.  Efforts to differentiate might include introducing discounts for cardholders at the point of sale (based on direct agreements between merchants and issuers) and investments to enhance the quality of various cardholder services and products.

187.  The geographic market for each of the relevant product markets has been the United States throughout the Damages Period, and that continues to be the case to this day.  Many of Visa's and Mastercard's rules regarding General Purpose Credit Card and General Purpose Debit Card transactions apply only to the U.S. market.  Visa and Mastercard also set policies and pricing—including Interchange Fees—separately for the United States from other regions. Additionally, U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards issued in other countries—and therefore other currencies—to be adequate substitutes for General Purpose Credit Cards or General Purpose Debit Cards issued by U.S. banks. Defendants have also demonstrated that small but significant, non-transitory increases in prices limited to these product markets in the United States have been profitable and have not caused merchants, ISOs, and PayFacs to turn to other services sufficiently to make these price increases unprofitable.

## CLAIMS FOR RELIEF

### Count 1:  Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the General Purpose Credit Card Transaction Market (Section 1 of Sherman Act)

188.  Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

189.  Visa and its member banks' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

190.  Visa and its member banks have maintained the conspiracy for Visa General Purpose Credit Card transactions throughout the Damages Period.

191.  This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Intuit and other merchants, ISOs, and PayFacs paid for Visa General Purpose Credit Card

-60-

1    transactions; and it imposed additional damages in the form of network fees, fines, and fraud

2    losses.  These price increases were the products of the agreement among Visa and its

3    owner/member banks that the banks will not compete for merchants, ISOs, and PayFacs'

4    acceptance of Visa transactions.

5         192.    The price-fixing conspiracy and agreement not to compete are *per se* unlawful

6    under Section 1 of the Sherman Act.  But even if analyzed under the rule of reason, this conspiracy

7    and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This

8    scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to

9    offset its substantial anticompetitive effects.

10        193.    Intuit suffered antitrust injury from these *per se* unlawful and/or unreasonable

11   restraints of trade.

12        194.    As a direct and proximate result of these violations of Section 1 of the Sherman Act

13   throughout the Damages Period, Intuit has been injured in its business and property in an amount

14   to be determined at trial.

15            **Count 2:  Against Visa for Horizontal Price Fixing and**

16         **Horizontal Agreements Not to Compete in the General Purpose**

17                   **Debit Card Transaction Market**

18                     **(Section 1 of Sherman Act)**

19        195.    Intuit incorporates by reference each and every allegation contained in the

20   foregoing paragraphs.

21        196.    Visa and its member banks' agreement not to compete and price-fixing schemes

22   constituted anticompetitive horizontal restraints.

23        197.    Visa and its member banks have maintained the conspiracy for Visa General

24   Purpose Debit Card transactions throughout the Damages Period.

25        198.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees

26   that Intuit and other merchants, ISOs, and PayFacs paid for Visa General Purpose Debit Card

27   transactions; and it imposed additional damages in the form of network fees, fines, and fraud

28   losses.  These price increases were the products of the agreement among Visa and its

-61-

owner/member banks that the banks will not compete for merchants, ISOs, and PayFacs'
acceptance of Visa transactions.

199.   The price-fixing conspiracy and agreement not to compete are *per se* unlawful
under Section 1 of the Sherman Act.  Even if analyzed under a rule of reason, this conspiracy and
agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This
scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to
offset its substantial anticompetitive effects.

200.   Intuit suffered antitrust injury from these *per se* unlawful and/or unreasonable
restraints of trade.

201.   As a direct and proximate result of these violations of Section 1 of the Sherman Act
throughout the Damages Period, Intuit has been injured in its business and property in an amount
to be determined at trial.

**Count 3:  Against Mastercard for Horizontal Price-Fixing and**

**Horizontal Agreements Not to Compete in the General Purpose**

**Credit Card Transaction Market**

**(Section 1 of Sherman Act)**

202.   Intuit incorporates by reference each and every allegation contained in the
foregoing paragraphs.

203.   Mastercard and its member banks' agreement not to compete and price-fixing
schemes constituted anticompetitive horizontal restraints.

204.   Mastercard and its member banks have maintained the conspiracy for Mastercard
General Purpose Credit Card transactions throughout the Damages Period.

205.   This conspiracy anticompetitively increased, and maintained, the Interchange Fees
that Intuit and other merchants, ISOs, and PayFacs paid for Mastercard General Purpose Credit
Card transactions; and it imposed additional damages in the form of network fees, fines, and fraud
losses.  These price increases were the products of the agreement among Mastercard and its
owner/member banks that the banks will not compete for merchants, ISOs, and PayFacs'
acceptance of Mastercard transactions.

-62-

206.    The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

207.    Intuit suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

208.    As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Intuit has been injured in its business and property in an amount to be determined at trial.

**Count 4:  Against Mastercard for Horizontal Price-Fixing**

**and Horizontal Agreements Not to Compete in the General Purpose**

**Debit Card Transaction Market**

**(Section 1 of Sherman Act)**

209.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

210.    Mastercard and its member banks' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

211.    Mastercard and its member banks have maintained the conspiracy for Mastercard General Purpose Debit Card transactions throughout the Damages Period.

212.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Intuit and other merchants, ISOs, and PayFacs paid for Mastercard General Purpose Debit Card transactions; and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Mastercard and its owner/member banks that the banks will not compete for merchants, ISOs, and PayFacs' acceptance of Mastercard transactions.

213.    The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  Even if analyzed under a rule of reason, this conspiracy and

-63-

1  agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This

2  scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to

3  offset its substantial anticompetitive effects.

4      214.    Intuit suffered antitrust injury from these *per se* unlawful and/or unreasonable

5  restraints of trade.

6      215.    As a direct and proximate result of these violations of Section 1 of the Sherman Act

7  throughout the Damages Period, Intuit has been injured in its business and property in an amount

8  to be determined at trial.

### Count 5:  Against Visa for Price Restraints in the
### General Purpose Credit Card Transaction Market
### (Section 1 of Sherman Act)

12      216.    Intuit incorporates by reference each and every allegation contained in the

13  foregoing paragraphs.

14      217.    Visa and its member banks' price-fixing schemes constituted unreasonable and

15  anticompetitive restraints.

16      218.    Visa entered into an express agreement with each of the member banks, binding all

17  of them to comply with the rules and regulations adopted by Visa, including the "default"

18  Interchange Fee and Honor All Cards rules.  In turn, Visa acted as the enforcement agent for its

19  rules and regulations and held Issuing and Acquiring members responsible for compliance with

20  these rules and regulations.  These agreements have continued in full effect throughout the

21  Damages Period.

22      219.    These price restraints imposed supracompetitive Interchange Fees on Intuit and

23  other merchants, ISOs, and PayFacs for Visa General Purpose Credit Card transactions; and it

24  imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints

25  have continued in full effect throughout the Damages Period and constituted unreasonable

26  restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate

27  business purpose, and achieved no legitimate efficiency benefit to offset its substantial

28  anticompetitive effects.

220.    Intuit suffered antitrust injury from these unreasonable restraints of trade.

221.    As a direct and proximate result of this violation of Section 1 of the Sherman Act, Intuit was injured in its business and property in an amount to be determined at trial.

**Count 6:  Against Visa for Price Restraints in the**

**General Purpose Debit Card Transaction Market**

**(Section 1 of Sherman Act)**

222.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

223.    Visa and its member banks' price-fixing schemes constituted unreasonable and anticompetitive restraints.

224.    Visa entered into an express agreement with each of the member banks, binding all of them to comply with the rules and regulations adopted by Visa, including the "default" Interchange Fee and Honor All Cards rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

225.    These price restraints imposed supracompetitive Interchange Fees on Intuit and other merchants, ISOs, and PayFacs for Visa General Purpose Debit Card transactions; and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

226.    Intuit suffered antitrust injury from these unreasonable restraints of trade.

227.    As a direct and proximate result of this violation of Section 1 of the Sherman Act, Intuit was injured in its business and property in an amount to be determined at trial.

-65-

**Count 7:  Against Mastercard for Price Restraints in the**

**General Purpose Credit Card Transaction Market**

**(Section 1 of Sherman Act)**

228.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

229.    Mastercard and its member banks' price-fixing schemes constituted unreasonable and anticompetitive restraints.

230.    Mastercard entered into an express agreement with each of the member banks, binding all of them to comply with the rules and regulations adopted by Mastercard, including the "default" Interchange Fee and Honor All Cards rules.  In turn, Mastercard acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

231.    These price restraints imposed supracompetitive Interchange Fees on Intuit and other merchants, ISOs, and PayFacs for Mastercard General Purpose Credit Card transactions; and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

232.    Intuit suffered antitrust injury from these unreasonable restraints of trade.

233.    As a direct and proximate result of this violation of Section 1 of the Sherman Act, Intuit was injured in its business and property in an amount to be determined at trial.

**Count 8:  Against Mastercard for Price Restraints in the**

**General Purpose Debit Card Transaction Market**

**(Section 1 of Sherman Act)**

234.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

-66-

235.    Mastercard and its member banks' price-fixing schemes constituted unreasonable and anticompetitive restraints.

236.    Mastercard entered into an express agreement with each of the member banks, binding all of them to comply with the rules and regulations adopted by Mastercard, including the "default" Interchange Fee and Honor All Cards rules.  In turn, Mastercard acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

237.    These price restraints imposed supracompetitive Interchange Fees on Intuit and other merchants, ISOs, and PayFacs for Mastercard General Purpose Debit Card transactions; and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

238.    Intuit suffered antitrust injury from these unreasonable restraints of trade.

239.    As a direct and proximate result of this violation of Section 1 of the Sherman Act, Intuit was injured in its business and property in an amount to be determined at trial.

**Count 9:  Against Visa for Monopolization of the**

**General Purpose Debit Card Transaction Market**

**(Section 2 of Sherman Act)**

240.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

241.    Through the anticompetitive acts set forth above, Visa has unlawfully acquired monopoly power in the General Purpose Debit Card Transaction Market.  Visa has taken acts that have the effect of giving it power over price and the power to exclude competition in the General Purpose Debit Card Transaction Market.

-67-

242.    Through the FANF, Visa has further unlawfully maintained its monopoly power through anticompetitive conduct that had the purpose and effect of excluding competition from, and raising the costs of, other providers of General Purpose Debit Card transactions.

243.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network transactions were set at artificial, supracompetitive levels and Intuit suffered injury to its business and property by paying such artificially-inflated, supracompetitive Interchange Fees and network fees, in an amount to be determined at trial.  Intuit suffered antitrust injury from these acts of monopolization.

244.    Visa's unlawful acquisition of monopoly power constituted a violation of Section 2 of the Sherman Act.  Visa's unlawful maintenance of monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

**Count 10:  Against Visa for Attempted Monopolization of the**

**General Purpose Debit Card Transaction Market**

**(Section 2 of Sherman Act)**

245.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

246.    Visa has taken acts that have the effect of giving Visa power over price and the power to exclude competition in the General Purpose Debit Card Transaction Market.

247.    Visa specifically intended to monopolize the General Purpose Debit Card Transaction Market, as evidenced by its specific intent to obtain power over Interchange Fee and network fee pricing for General Purpose Debit Card transactions, its specific intent to exclude competition in the General Purpose Debit Card Transaction Market, and by its specific intent to take acts with the effects of giving Visa power over price and excluding competition.

248.    To the extent it does not already possess monopoly power, there is a dangerous probability that Visa will obtain monopoly power in the General Purpose Debit Card Transaction Market through the FANF.

249.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card transactions were set at artificial,

-68-

1  supracompetitive levels and Intuit suffered injury to its business and property by paying such

2  artificially-inflated, supracompetitive Interchange Fees.  Intuit suffered antitrust injury from these

3  attempted acts of monopolization.

4       250.   Visa's attempted monopolization constituted and, through the FANF, continues to

5  constitute a violation of Section 2 of the Sherman Act.

6  **Count 11:  Against Visa for Conspiracy to Monopolize the**

7  **General Purpose Debit Card Transaction Market**

8  **(Section 2 of Sherman Act)**

9       251.   Intuit incorporates by reference each and every allegation contained in the

10  foregoing paragraphs.

11       252.   Visa and its member banks combined and conspired among themselves with the

12  specific intent to monopolize the General Purpose Debit Card Transaction Market.

13       253.   This conspiracy was successful, as Visa, through the overt acts described above,

14  acquired, enhanced, and maintained monopoly power in the General Purpose Debit Card

15  Transaction Market throughout the Damages Period.

16       254.   As a direct and proximate result of Visa and its member banks' conspiracy to

17  monopolize, Interchange Fees for General Purpose Debit Card transactions were set at artificial,

18  supracompetitive levels, and Intuit suffered antitrust injury to its business and property by paying

19  such artificially-inflated, supracompetitive Interchange Fees.

20       255.   Visa and its member banks' conspiracy to monopolize constituted, and through the

21  FANF continues to constitute, a violation of Section 2 of the Sherman Act.

22  **Count 12:  Against Visa for Violation of California State**

23  **Antitrust Law in the General Purpose Credit Card Transaction**

24  **Market (Cal. Bus. & Prof. Code § 16700 *et seq.*)**

25       256.   Intuit incorporates by reference each and every allegation contained in the

26  foregoing paragraphs.

27       257.   Visa has market power in the General Purpose Credit Card Transaction Market.

28

-69-

258.     Visa and its member banks—direct, horizontal competitors of each other—have engaged in unlawful contracts, combinations and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*).  These unlawful contracts, combinations, and conspiracies were entered into and effectuated within the State of California.

259.     The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings and concerts of action between and among Visa's member banks and Visa, the substantial terms of which were to illegally fix, raise, maintain or stabilize the Interchange Fees charged to Intuit and other merchants, ISOs, and PayFacs in the General Purpose Credit Card Transaction Market.

260.     Visa's Board of Directors, which included representatives from several of Visa's member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for Visa transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

261.     All of Visa's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

262.     As a direct consequence of the contract, combination, conspiracy, and agreement, actual and potential competition in the General Purpose Credit Card Transaction Market was substantially excluded, suppressed and effectively foreclosed.

263.     Visa derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Credit Card Transaction Market.

264.     But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the credit card Interchange Fees in order to gain business from merchants, ISOs, and PayFacs, including Intuit.

265.     The collectively-fixed credit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the Visa network.  Visa and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Credit Card Transaction Market.  Even if some horizontal agreement was necessary to promote the efficiencies of the Visa network, the

-70-

1  collectively-set credit card Interchange Fee is significantly more restrictive than necessary to bring

2  about those efficiencies.

3       266.    As a direct and proximate consequence of Visa's anticompetitive conduct, Intuit

4  suffered injury in its business and property, in an amount to be determined at trial, by having to

5  pay such artificially inflated, supracompetitive Interchange Fees for General Purpose Credit Card

6  transactions.  Intuit's injury is the type of injury the Cartwright Act and the other antitrust laws

7  were designed to prevent and flows from that which makes Visa's and its member banks' conduct

8  unlawful.

9  **Count 13:  Against Visa for Violation of California State Antitrust Law**

10  **in the Market for General Purpose Debit Card Services**

11  **(Cal. Bus. & Prof. Code § 16700 *et seq.*)**

12       267.    Intuit incorporates by reference each and every allegation contained in the

13  foregoing paragraphs.

14       268.    Visa has market power in the General Purpose Debit Card Transaction Market.

15       269.    Visa and its member banks—direct, horizontal competitors of each other—have

16  engaged in unlawful contracts, combinations and conspiracies in an unreasonable restraint of

17  interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. &

18  Prof. Code § 16700 *et seq.*).  These unlawful contracts, combinations, and conspiracies were

19  entered into and effectuated within the State of California.

20       270.    The unlawful contracts, combinations and conspiracies consisted of continuing

21  agreements, understandings and concerts of action between and among Visa's member banks and

22  Visa, the substantial terms of which were to illegally fix, raise, maintain or stabilize the

23  Interchange Fees charged to Intuit and other merchants, ISOs, and PayFacs in the General Purpose

24  Debit Card Transaction Market.

25       271.    Visa's Board of Directors, which included representatives from several of Visa's

26  member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for Visa transactions,

27  in violation of § 16700 *et seq.* of the Cartwright Act.

28

272.    All of Visa's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

273.    As a direct consequence of the contract, combination, conspiracy and agreement, actual and potential competition in the General Purpose Debit Card Transaction Market was substantially excluded, suppressed and effectively foreclosed.

274.    Visa derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Debit Card Transaction Market.

275.    But for the anticompetitive conduct of Visa and its member banks, competition among banks would have eliminated or greatly reduced the debit card Interchange Fees in order to gain business from merchants, ISOs, and PayFacs, including Intuit.

276.    The collectively-fixed debit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the Visa network.  Visa and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Debit Card Transaction Market.  Even if some horizontal agreement was necessary to promote the efficiencies of the Visa network, the collectively-set debit card Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.

277.    As a direct and proximate consequence of Visa's anticompetitive conduct, Intuit suffered injury in its business and property, in an amount to be determined at trial, by having to pay such artificially inflated, supracompetitive Interchange Fees for General Purpose Debit Card transactions.  Intuit's injury is the type of injury the Cartwright Act and the other antitrust laws were designed to prevent and flows from that which makes Visa's and its member banks' conduct unlawful.

**Count 14:  Against Mastercard for Violation of California State**
**Antitrust Law in the General Purpose Credit Card Transaction Market**
**(Cal. Bus. & Prof. Code § 16700 *et seq.*)**

278.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

-72-

279.     Mastercard has market power in the General Purpose Credit Card Transaction Market.

280.     Mastercard and its member banks—direct, horizontal competitors of each other—have engaged in unlawful contracts, combinations and conspiracies in an unreasonable restraint of interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*).  These unlawful contracts, combinations and conspiracies were entered into and effectuated within the State of California.

281.     The unlawful contracts, combinations, and conspiracies consisted of continuing agreements, understandings and concerts of action between and among Mastercard's member banks and Mastercard, the substantial terms of which were to illegally fix, raise, maintain or stabilize the Interchange Fees charged to Intuit and other merchants, ISOs, and PayFacs in the General Purpose Credit Card Transaction Market.

282.     Mastercard's Board of Directors, which included representatives from several of Mastercard's member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for Mastercard transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

283.     All of Mastercard's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

284.     As a direct consequence of the contract, combination, conspiracy and agreement, actual and potential competition in the General Purpose Credit Card Transaction Market was substantially excluded, suppressed and effectively foreclosed.

285.     Mastercard derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Credit Card Transaction Market.

286.     But for the anticompetitive conduct of Mastercard and its member banks, competition among banks would have eliminated or greatly reduced the credit card Interchange Fees in order to gain business from merchants, ISOs, and PayFacs, including Intuit.

287.     The collectively-fixed credit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the Mastercard network.  Mastercard and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its

-73-

1  demonstrated anticompetitive effects in the General Purpose Credit Card Transaction Market.

2  Even if some horizontal agreement was necessary to promote the efficiencies of the Mastercard

3  network, the collectively-set credit card Interchange Fee is significantly more restrictive than

4  necessary to bring about those efficiencies.

5  288.   As a direct and proximate consequence of Mastercard's anticompetitive conduct,

6  Intuit suffered injury in its business and property, in an amount to be determined at trial, by having

7  to pay such artificially inflated, supracompetitive Interchange Fees for General Purpose Credit

8  Card transactions.  Intuit's injury is the type of injury the Cartwright Act and the other antitrust

9  laws were designed to prevent and flows from that which makes Mastercard's and its member

10  banks' conduct unlawful.

11  ### Count 15:  Against Mastercard for Violation of California State

12  ### Antitrust Law in the General Purpose Debit Card Transaction Market

13  ### (Cal. Bus. & Prof. Code § 16700 *et seq.*)

14  289.   Intuit incorporates by reference each and every allegation contained in the

15  foregoing paragraphs.

16  290.   Mastercard has market power in the General Purpose Debit Card Transaction

17  Market.

18  291.   Mastercard and its member banks—direct, horizontal competitors of each other—

19  have engaged in unlawful contracts, combinations and conspiracies in an unreasonable restraint of

20  interstate trade or commerce in violation of § 16700 *et seq.* of the Cartwright Act (Cal. Bus. &

21  Prof. Code § 16700 *et seq.*).  These unlawful contracts, combinations and conspiracies were

22  entered into and effectuated within the State of California.

23  292.   The unlawful contracts, combinations and conspiracies consisted of continuing

24  agreements, understandings and concerts of action between and among Mastercard's member

25  banks and Mastercard, the substantial terms of which were to illegally fix, raise, maintain or

26  stabilize the Interchange Fees charged to Intuit and other merchants, ISOs, and PayFacs in the

27  General Purpose Debit Card Transaction Market.

28

-74-

293.    Mastercard's Board of Directors, which included representatives from several of Mastercard's member banks, voted to fix, raise, maintain or stabilize the Interchange Fees for Mastercard transactions, in violation of § 16700 *et seq.* of the Cartwright Act.

294.    All of Mastercard's member banks have had an actual knowledge of, and have knowingly participated in, the conspiracy alleged herein.

295.    As a direct consequence of the contract, combination, conspiracy and agreement, actual and potential competition in the General Purpose Debit Card Transaction Market was substantially excluded, suppressed and effectively foreclosed.

296.    Mastercard derived direct and substantial economic benefits from the supracompetitive Interchange Fees in the General Purpose Debit Card Transaction Market.

297.    But for the anticompetitive conduct of Mastercard and its member banks, competition among banks would have eliminated or greatly reduced the debit card Interchange Fees in order to gain business from merchants, ISOs, and PayFacs, including Intuit.

298.    The collectively-fixed debit card Interchange Fee is illegal.  It is not necessary to accomplish any procompetitive benefit to the Mastercard network.  Mastercard and its member banks' price fixing achieved few, if any, procompetitive benefits to counterbalance its demonstrated anticompetitive effects in the General Purpose Debit Card Transaction Market. Even if some horizontal agreement was necessary to promote the efficiencies of the Mastercard network, the collectively-set debit card Interchange Fee is significantly more restrictive than necessary to bring about those efficiencies.

299.    As a direct and proximate consequence of Mastercard's anticompetitive conduct, Intuit suffered injury in its business and property, in an amount to be determined at trial, by having to pay such artificially inflated, supracompetitive Interchange Fees for General Purpose Debit Card transactions.  Intuit's injury is the type of injury the Cartwright Act and the other antitrust laws were designed to prevent and flows from that which makes Mastercard's and its member banks' conduct unlawful.

-75-

**Count 16:  Against Visa for Unfair and Unlawful Business Practices in**

**Violation of California State Unfair Competition Law**

**(Cal. Bus. & Prof. Code § 17200 *et seq.*)**

300.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

301.    Through their conduct alleged in this Complaint, Visa and its member banks have engaged in unlawful business practices, in violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*).  As alleged herein, Visa and its member banks' conduct violates other laws, including Sections 1 and 2 of the federal Sherman Act (15 U.S.C. §§ 1 and 2), the California Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*), and other state antitrust and unfair competition laws.

302.    Through their conduct alleged in this Complaint, Visa and its member banks have also engaged in unfair business practices, in violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*).  As alleged herein, Visa and its member banks' conduct threatens an incipient violation of the antitrust and competition laws, including Sections 1 and 2 of the federal Sherman Act (15 U.S.C. §§ 1 and 2), the California Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*), and other state antitrust and unfair competition laws, and violates the policy and spirit of such laws or otherwise significantly threatens and harms competition.

303.    As a result of Visa and its member banks' unlawful and unfair business practices, Intuit has suffered and will suffer injury in fact and has lost and will lose money and property.

**Count 17:  Against Mastercard for Unfair and Unlawful Business Practices in**

**Violation of California State Unfair Competition Law**

**(Cal. Bus. & Prof. Code § 17200 *et seq.*)**

304.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

305.    Through their conduct alleged in this Complaint, Mastercard and its member banks have engaged in unlawful business practices, in violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*).  As alleged herein, Mastercard and its member

-76-

banks' conduct violates other laws, including Sections 1 and 2 of the federal Sherman Act (15 U.S.C. §§ 1 and 2), the California Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*), and other state antitrust and unfair competition laws.

306.    Through their conduct alleged in this Complaint, Mastercard and its member banks have also engaged in unfair business practices, in violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*).  As alleged herein, Mastercard and its member banks' conduct threatens an incipient violation of the antitrust and competition laws, including Sections 1 and 2 of the federal Sherman Act (15 U.S.C. §§ 1 and 2), the California Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*), and other state antitrust and unfair competition laws, and violates the policy and spirit of such laws or otherwise significantly threatens and harms competition.

307.    As a result of Mastercard and its member banks' unlawful and unfair business practices, Intuit has suffered and will suffer injury in fact and has lost and will lose money and property.

### Count 18:  Against Visa and Mastercard for Violation of State
### Antitrust and Unfair Competition Laws

308.    Intuit incorporates by reference each and every allegation contained in the foregoing paragraphs.

309.    Defendants' conduct described in the foregoing paragraphs caused Intuit to pay supracompetitive prices on transactions throughout the United States and within each of the states referenced in Paragraphs 310-336, below.

310.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Alabama Code §§ 6-5-60, 8-10-1 *et seq.*

311.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 *et seq.*

312.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Connecticut Stat. § 35-24 *et seq.*

-77-

313.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 28-4501 *et seq.*

314.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 501.201 *et seq.*

315.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 *et seq.*

316.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 *et seq.*

317.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 *et seq.*

318.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 *et seq.*

319.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine Rev. Stat. Ann. tit. 10, § 1101 *et seq.*

320.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 *et seq.*

321.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. § 325D.49 *et seq.*

322.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Mississippi Code Ann. § 75-21-1 *et seq.*

323.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 *et seq.*

324.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. § 598A.010 *et seq.*

325.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 *et seq.*

326.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 *et seq.* and § 369-A.

327.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 *et seq.*

328.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51-08.1-01 *et seq.*

329.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. § 646.705 *et seq.*

330.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws § 6-36-1 *et seq.*

331.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1-3.1 *et seq.*

332.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 *et seq.*

333.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. tit. 9, § 2451 *et seq.*

334.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of West Virginia Code § 47-18-1 *et seq.*

335.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wisconsin Stat. § 133.01 *et seq.*

336.    As a direct and proximate result of Defendants' unlawful conduct, Intuit suffered injury to its business and property in each of these states by paying such artificially-inflated, supracompetitive Interchange Fees for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

## **PRAYER FOR RELIEF**

WHEREFORE, Intuit prays for a judgment in its favor and against Defendants and for the following relief:

A.   That the Court declare, adjudge and decree that Defendants have committed the violations of federal and state laws alleged herein;

B.   That the Court award damages sustained by Intuit because of Defendants' misconduct, in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees and costs of suit;

C.   That the Court enjoin Visa's FANF; and

D.   That the Court order such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Intuit hereby demands a trial by jury of all issues properly triable thereby.

DATED:  February 19, 2021                 Respectfully submitted,

                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By   */s/ Adam B. Wolfson*
                                               Adam B. Wolfson
                                               Kevin Y. Teruya

                                               Attorneys for Intuit Inc. and
                                               Intuit Payment Solutions, LLC

-80-